UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MISSY CHASE LAPINE and THE SNEAKY
CHEF, INC.,

                     Plaintiffs,

        v.

JESSICA SEINFELD, JERRY SEINFELD,
HARPERCOLLINS PUBLISHERS, INC., and
DEPARTURE PRODUCTIONS, LLC,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

*ORAL ARGUMENT REQUESTED*

08-CV-128 (LTS) (RLE)

## DECLARATION OF ORIN SNYDER IN SUPPORT OF JERRY SEINFELD'S MOTION TO DISMISS THE SIXTH CLAIM OF THE FIRST AMENDED COMPLAINT

ORIN SNYDER, pursuant to 28 U.S.C. § 1746, hereby declares:

1.      I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, counsel to Defendant Jerry Seinfeld ("Mr. Seinfeld"). I respectfully submit this Declaration in support of Mr. Seinfeld's Motion to Dismiss the Sixth Claim for Relief of the First Amended Complaint.

2.      Exhibit A is a true and correct copy of the Complaint, dated January 7, 2008.

3.      Exhibit B is a true and correct copy of Defendants' Answer to the Complaint, dated February 22, 2008.

4.      Exhibit C is a true and correct copy of the Amended Complaint, dated April 17, 2008.

5.      Exhibit D is a true and correct copy of a recording of Mr. Seinfeld's October 29, 2007 appearance on the *Late Show with David Letterman*.

6.      Exhibit E is a true and correct copy of a transcript of Mr. Seinfeld's October 29, 2007 appearance on the *Late Show with David Letterman*.

7.    Exhibit F is a true and correct copy of a recording of Mr. Seinfeld's October 29, 2007 appearance on *E! News Live*.

8.    Exhibit G is a true and correct copy of a transcript of Mr. Seinfeld's October 29, 2007 appearance on *E! News Live*.

9.    Exhibit H is a true and correct copy of the *Encyclopedia Britannica* entry for "Jerry Seinfeld."

10.    Exhibit I is a true and correct copy of the *Encyclopedia Britannica* entry for "Seinfeld."

11.    Exhibit J is a true and correct copy of the *Encyclopedia Britannica* entry for "David Letterman."

12.    Exhibit K is a true and correct copy of an October 19, 2007 *Wall Street Journal* article entitled "How Another Seinfeld Scored Her Own Big Hit."

I hereby declare that the foregoing is true and correct to the best of my knowledge. Executed on June 17, 2008.

_____
Orin Snyder (OS-3122)

100464049_1.DOC

# Exhibit A

ORIGINAL

JUDGE SWAIN

KASOWITZ, BENSON TORRES & FRIEDMAN LLP
Marc E. Kasowitz (MK 2597)
Daniel R. Benson (DB 6587)
Mark P. Ressler (MR 4985)
Maria Gorecki (MG 3205)
Rachel E. Lubert (RL 1563)
1633 Broadway
New York, New York 10019
Phone: (212) 506-1700
Fax:    (212) 506-1800

08 CV 00128

Attorneys for Plaintiffs
Missy Chase Lapine and The Sneaky Chef, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                      :
MISSY CHASE LAPINE and THE SNEAKY          :     <u>COMPLAINT</u>
CHEF, INC.,                                           :
                                                      :
                      Plaintiffs,                     :     Jury Trial Demanded
                                                      :
           - against -                                :
                                                      :
JESSICA SEINFELD and JERRY SEINFELD,        :
                                                      :
                      Defendants.                     :
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

        Plaintiffs Missy Chase Lapine and The Sneaky Chef, Inc., by their attorneys Kasowitz,

Benson, Torres & Friedman LLP, for their complaint against defendants Jessica Seinfeld and

Jerry Seinfeld, allege as follows:

<u>PRELIMINARY STATEMENT</u>

        1.      This action for copyright and trademark infringement and defamation arises from

conduct that gives new meaning to the terms "arrogance" and "greed."  In April 2007, plaintiff

Missy Chase Lapine, based on years of research, published <u>The Sneaky Chef:  Simple Strategies</u>

for Hiding Healthy Foods in Kids' Favorite Meals (the "Book" or "The Sneaky Chef"). The Sneaky Chef achieved immediate critical acclaim and commercial success for its unique and innovative approach to improving children's eating habits by, among other things, camouflaging purees of carefully selected fruits and vegetables (like spinach and sweet potato) as ingredients in unhealthy foods desired by children, like cheeseburgers, grilled cheese sandwiches and brownies.

2.    Six months later, defendant Jessica Seinfeld published Deceptively Delicious: Simple Secrets to Getting Your Kids Eating Good Food (the "Infringing Work" or "Deceptively Delicious"), which brazenly plagiarized The Sneaky Chef, even misappropriating the Book's trademark, a caricature of a winking chef holding a finger to her lips (as if to say "shhh") and hiding carrots behind her back. Fueled by a massive, celebrity-driven marketing campaign, Jessica Seinfeld's book became a commercial success, climbing to the top of The New York Times best seller list. That success, however, was accompanied by accusations on the Internet and in the media that, based on the striking and substantial similarities between the two books, Jessica Seinfeld had plagiarized The Sneaky Chef.

3.    Seeking to deflect those accusations, and apparently not content that his wife had unlawfully misappropriated Lapine's book, Jerry Seinfeld, Jessica's husband, embarked on a national media campaign of malicious defamation against Lapine. On the Late Night With David Letterman show, Jerry Seinfeld stated, among other things, that his wife's book came out "at the same time" as Lapine's; that his wife "never saw" or "read" Lapine's book before hers was published; that Lapine was a "wacko" celebrity stalker who, like the infamous stalkers who had terrorized David Letterman and his family, "waited in the woodwork" to "spring out" and attack his wife with plagiarism charges; and that Lapine was an "angry and hysterical" woman who posed a potentially violent threat ("assassin") to the Seinfelds. Likewise, on E! News,

2

Seinfeld referred repeatedly to Lapine as a "nut job" who had "come[] out of the woodwork" to attack his wife with false accusations of plagiarism.

4.    All of Jerry Seinfeld's statements were false. Jessica Seinfeld's book came out six months after Lapine's; Jessica Seinfeld saw and read the Book before hers was published; Lapine does not suffer from any mental infirmity; she is not a celebrity stalker; she is not a violent or dangerous person; she did not and does not engage in extortion; she is not a liar; she did not, until the filing of this complaint, make any specific accusations against Jessica Seinfeld (although she had more than ample grounds to do so); she did not fabricate accusations against Jessica Seinfeld to gain media attention, enrich herself or harass the Seinfelds; and she was not lying in wait for an opportunity to become embroiled in a controversy with any celebrity -- much less the Seinfelds.

5.    Jessica Seinfeld's brazen plagiarism of Lapine's book constitutes copyright and trademark infringement under federal and New York law. Jerry Seinfeld's malicious, nationally-televised attack on Lapine constitutes slander under New York law. Jerry Seinfeld is an enormously wealthy and well-known comedian, and Jessica Seinfeld is his wife, but that does not give them license to slander and plagiarize. Accordingly, Lapine brings this action to recover compensatory and punitive damages.

<u>JURISDICTION AND VENUE</u>

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b) and 15 U.S.C. § 1121, as well as the doctrine of pendent jurisdiction.

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as the claims arise, and defendants reside, in this district.

3

## THE PARTIES

8.    Plaintiff Missy Chase Lapine is a citizen of the State of New York and resides in Irvington, New York.

9.    Plaintiff The Sneaky Chef, Inc. is a corporation organized and existing under the law of the State of New York, with its principal place of business in Irvington, New York.

10.    Defendant Jessica Seinfeld is a citizen of the State of New York and resides in New York, New York.

11.    Defendant Jerry Seinfeld is a citizen of the State of New York and resides in New York, New York. Jerry Seinfeld is an enormously wealthy and well-known comedian. From 1990 to 1998, he was the star of Seinfeld, one of the most popular programs in television history. He is married to defendant Jessica Seinfeld.

## FACTS

### Lapine Conceives of, Researches and Creates the Book

12.    Lapine's professional work has focused on food, nutrition and health. She is the former publisher of Eating Well magazine and, before that, worked at Gourmet magazine. Lapine is certified in the master techniques of healthy cooking and was trained in classical cooking techniques by the Institute of Culinary Education. Lapine serves on the Culinary Arts Faculty of The New School in New York City; is a collaborator with the Alliance for a Healthier Generation, a partnership between the American Heart Association and the William J. Clinton Foundation devoted to helping schools serve healthier lunches; and serves on the Children's Advisory Council of Morgan Stanley Children's Hospital of New York-Presbyterian, where The Sneaky Chef nutrition techniques are used with pediatric patients.

4

13.    In or about 2002, Lapine began researching methods for getting children to eat healthier foods. Lapine conducted numerous taste tests, focus groups and interviews, and consulted extensively with leading nutritionists, pediatricians and chefs. Her research resulted in an innovative solution: camouflage healthy foods so that children will eat them without realizing or objecting. Lapine developed original methods for combining ingredients, including specially-selected purees of vegetables that children typically resist, such as spinach or cauliflower, with dishes that children typically crave, such as brownies, pizza and pancakes.

14.    Lapine then prepared a manuscript of the Book that set forth Lapine's views on nutrition, child-rearing and American eating habits, as well as her explanation of the purees and how to put her methods to use.

15.    On or about February 6, 2006, Lapine sent a 139-page book proposal, which included extensive chapters from the Book manuscript, to HarperCollins Publishers, LLC ("HarperCollins"). Four days later, a representative from William Morrow, an imprint of HarperCollins, sent Lapine a letter rejecting the proposal. In or about early May 2006, Lapine, through her literary agent, again submitted to HarperCollins her book proposal, again including extensive chapters from the Book manuscript. On May 24, 2006, HarperCollins rejected Lapine's second proposal, stating that "the children's food segment of the market is a tough one to navigate during a particularly tough time in the cookbook category in general. The influence of the food network and the availability of recipes online have really hurt this area. I'm sorry to say we'll be passing . . ."

5

Lapine Publishes the Book and Obtains
<u>Copyright and Trademark Protection</u>

16.     In or about June 2006, Perseus Books Group ("Perseus"), another book publisher,

accepted Lapine's proposal for the Book.  On or about August 1, 2006, Lapine and Perseus

entered into a contract for publication of the Book.  On or about April 2, 2007, Perseus, through

its Running Press imprint, released the Book.  The reviews were extremely positive, with the

culinary press and general media lauding Lapine's revolutionary approach to disguising healthy

foods inside children's favorite dishes.  Within three weeks of publication, the Book became a

<u>New York Times</u> best seller.

17.     Lapine also has filed applications with the United States Copyright Office for

copyright registration of the Book, and The Sneaky Chef, Inc. has filed applications with the

United States Patent and Trademark Office for trademark registration of the word trademark

"Sneaky Chef" and the image trademark that appears on and in the Book and on plaintiffs' Web

site.  The Sneaky Chef, Inc. is the co-owner with Lapine of all rights to the trademarks and is

engaged, together with Lapine, in developing and marketing books, DVDs and other products

that are based on Lapine's methods and concepts and utilize the trademarks.

18.     As part of a campaign to market and promote the Book, Lapine appeared on the

<u>Today Show</u>, <u>Fox and Friends</u> and numerous other television programs; appeared on numerous

national and local radio programs; was featured in national magazines such as <u>Parenting</u> and

<u>Women's Day</u> and in numerous newspapers; and did a book tour throughout the country, which

included bookstore and supermarket appearances and signings.

Jessica Seinfeld Copies the Book, Notwithstanding a
Ccase And Desist Demand from Lapine and Her Publisher

19.    In or about May 2007, while promoting and marketing the Book, Lapine learned

that Jessica Seinfeld and her publisher, HarperCollins, were planning to publish the Infringing

Work. In an eight-page promotional brochure for the Infringing Work she received, Lapine

observed blatant similarities between the Infringing Work, including, among other things, its

cover design and content, and the Book. Lapine immediately brought these similarities to the

attention of her publisher.

20.    On or about July 9, 2007, seeking to prevent any violation of Lapine's rights,

Running Press brought to the attention of Jessica Seinfeld's publisher the blatant similarities

between the Book and the plans for the Infringing Work (including the cover art, the subtitles,

the organization and the overall look and feel).

21.    On or about July 31, 2007, Jessica Seinfeld's publisher sent Running Press a letter

denying that Jessica Seinfeld copied, or was even influenced by, the Book, asserting that the

Infringing Work was "entirely original to" Jessica Seinfeld, and stating that "we do not believe it

necessary or appropriate to make any changes to the design or content of [the Infringing Work]."

22.    The Infringing Work was published in October 2007, with only minor and

insignificant modifications to the cover art and subtitle -- the cover design of the Infringing

Work was slightly altered by moving the pictured carrots from their original position (held in the

female chef's hand behind her back, exactly where the chef in The Sneaky Chef trademark holds

her carrots) to a cutting board behind her back, and the Infringing Work's subtitle was slightly

changed from "Sneaky Secrets to Get Your Kids Eating Good Food" to "Simple Secrets to Get

Your Kids Eating Good Food."

Jessica Seinfeld Infringed Lapine's Copyright

23.     In writing and publishing the Infringing Work -- which, in its content, artwork and overall look and feel, is substantially similar to the Book -- Jessica Seinfeld blatantly and willfully misappropriated the Book's original concept, expression, methodology, organization, structure, design, styling and look and feel.

24.     Jessica Seinfeld's infringement consists of copying Lapine's copyrighted original expression, philosophy, premise, approach, explanations, discussions, reflections, organization, methodology and overall look and feel, including (without limitation) the following respects:

(a)     Both the Book and the Infringing Work contain introductions written by doctors calling attention to the growing problem of obesity in American children and the difficulties inherent in providing sound nutrition to resistant children, and praising the author for creative, clever and convenient solutions for parents.

(b)     Both the Book and the Infringing Work state that children need to feel a semblance of control over what they eat, while calling attention to the connection between good nutrition and how children behave and achieve.  Both works discuss the dangers of too much sugar in a child's diet (e.g., the sugar high and ensuing crash).  Both works address these issues by recommending camouflaging carefully-selected pureed healthy foods inside children's favorite foods.

(c)     Both the Book and the Infringing Work begin with the author's personal anecdote of mealtime struggles with her own picky eaters.  In fact, both works include a story about how one of the author's children is a picky eater who influenced a non-picky sibling to dislike food.  Specifically, within that anecdote:

8

- the Book describes "*begging*, pleading, threatening, and bribing," as well as "*coercing kids to eat* what's on their plates."

- the Infringing Work describes "*begging* my kids to eat vegetables," as well as "*coerc[ing] them to eat* food they found disgusting."

(d)     Both the Book and the Infringing Work explain that the author is not a professional chef, just a mother who desires to have peace at the dinner table and to feed her children nutritious food. Both works discuss how the author overcame the guilt of tricking her kids into eating healthy food.

- The Book states that "this method has brought *peace to our family table*," that "[i]n many families, the dinner table becomes a battleground and meal time is a *power struggle*," and that "I couldn't use logic, but I couldn't afford to *give up* either."

- The Infringing Work states: "I just wanted a little *peace around the dinner table*," and continues, "I want my kids to associate food and mealtimes with happiness and conversations, not *power struggles* and strife." The Infringing Work acknowledges, "[W]e just want to *give up*."

(e)     Both the Book and the Infringing work characterize the author's solution as an "*epiphany*" and state the benefits that accompany nutritional camouflage.

- The Book explains: "There are many *foods that kids won't go near* in their virgin condition, but after ten seconds in the blender, those same

broccoli stalks they made a face at yesterday are now eaten without a fight."

- The Infringing Work explains: "I have become an expert at hiding vegetables purees and other healthful additional - *foods my kids wouldn't touch* otherwise - in all of their favorite dishes."

- As an example, both the Book and the Infringing Work advocate allowing children to put *sprinkles* on their food to enhance its appeal.

(f)     Both the Book and the Infringing Work discuss how the author succeeded in hiding "good-for-you" foods in the dishes that kids naturally love, and how the author's family is now happier.

- The Book states: "It got our *whole family* eating together in peace."

- The Infringing states: "[T]he *whole family* is happier and we can finally enjoy mealtimes again."

(g)     Both the Book and the Infringing Work address arguments against "sneaking" vegetables into children's dishes and then systematically refute each one.

- The Book likens the practice to a form of "*loving deceit.*"

- The Infringing Work likens the practice to a form of "*[l]oving [d]eception.*"

(h)     Both the Book and the Infringing Work state that forbidden foods are more alluring to children and suggest that, for that reason, foods such as candy should not be forbidden.

(i)     Both the Book and the Infringing Work provide explanatory passages at the beginning of the work regarding nutrition and directions for the creation and use of the purees, with the latter portion of the work discussing the use of the purees.

(j)     The Book, on its cover, spine and first page, uses the caricature of a chef, winking, holding a finger to her lips as if saying "shhh" and hiding carrots behind her back, as well as repeatedly using a drawing of a carrot wearing sunglasses making the same "shhh" gesture. In a substantially similar way, the cover of the Infringing Work uses a caricature of Jessica Seinfeld as a chef, winking, with carrots on a cutting board behind her back, as well as repeatedly using, including on its spine, first page and insert, a drawing of Jessica Seinfeld holding a finger to her lips as if saying "shhh."

(k)     The subtitle of the Book, "Simple Strategies for Hiding Healthy Foods in Kids' Favorite Meals," is substantially similar to the subtitle of the Infringing Work, "Simple Secrets to Get your Kids Eating Good Food."

(l)     In both the Book and the Infringing Work, each recipe is printed on a page with a border around the text. In the Book, the border is a straight-line box; in the Infringing Work, the border is a wavy-line box.

(m)     Both the Book and the Infringing Work use line-drawn, cartoon graphics, except when showing dishes made according to recipes, they use full-color photographs.

(n)     Both the Book and the Infringing Work include icons with each recipe. The Book uses icons that represent the particular sneaky method used; the Infringing Work uses icons that represent the particular fruits and vegetables used.

(o)     Both the Book and the Infringing Work, in setting forth the use of purees, use a different font color for purees from the color used for the other ingredients.

(p)     Both the Book and the Infringing Work suggest the same approach to cooking healthy food for children -- get the right tools (e.g., a small food processor), get the "*staple*" foods, make the vegetable and fruit purees once a week and refrigerate or freeze them, and then, at meal time, make the recipes using the purees to inject healthy foods into the dishes.

(q)     Both the Book and the Infringing Work next set forth the staples of a well-stocked kitchen, including a list of which foods children will most often and least often eat without a fight.

(r)     Both the Book and the Infringing Work recommend *steaming* the vegetables, pureeing them in a *food processor, packaging* them in *1/4 cup baggies*, and then *freezing* them for later use.

- The Book states: "[Y]ou will find the Make-Ahead . . . are your best friends . . . once you have these purees and blends in your refrigerator or freezer, *simply grab a spoonful and mix it into the recipes as called for*." The Book claims that with respect to ". . . the scratch recipes, you'll spend *less than thirty minutes* for each one."

- The Infringing Work states: "You will quickly learn to prepare, cook, puree, and portion the purees. Then the *purees will be available to use when they're called for*, just like any other ingredient in my recipes."

The Infringing Work claims that ". . . the recipes . . . are doable in *thirty minutes or less* . . ."

(s)     Both the Book and the Infringing Work talk about "*sneak*[ing]" the purees into typical kid food to remove "stress." The Book calls this being "*sneaky*," and the Infringing Work refers to it as the "*sneak it in*" technique.

- The Book states: "*[P]arental control* does not have to come in the form of a *constant battle*."

- The Infringing Work states: "It empowers you to exert some legitimate *control* over what your children eat, without inviting the *usual fights*."

(t)     Both the Book and the Infringing Work also provide suggestions for and explanations of how purees can be incorporated into pre-packaged, store-bought foods.

(u)     Both the Book and the Infringing Work implore the reader to enthusiastically test the purees and recipes.

- The Book states, "[L]et's put these clever methods into *action*"

- The Infringing Work states, "[Y]ou're *ready for action*."

(v)     Both the Book and the Infringing Work suggest adding the same specific fruit or vegetable puree to the same dishes, as set forth below:

| Children's Dish | Hidden Puree Used in the Book | Hidden Puree Used in the Infringing Work |
|---|---|---|
| Chocolate Pudding | Avocado | Avocado |

| | | |
|---|---|---|
| Chocolate Chip Cookies | White Bean | White Bean |
| Brownies | Spinach | Spinach |
| Grilled Cheese | Sweet Potato | Sweet Potato |
| French Toast | Sweet Potato/Carrot | Sweet Potato/Carrot |
| Mac 'n Cheese | Cauliflower | Cauliflower |
| Meat Sauce/Bolognese | Sweet Potato | Sweet Potato |
| Twice-Baked Potatoes | Cauliflower | Cauliflower |
| Chicken Tenders | Sweet Potato | Sweet Potato |
| Peanut Butter and Jelly Muffins | Carrot | Carrot |
| Green Eggs | Spinach | Spinach |

**To Deflect Attention From His Wife's Infringement,
Jerry Seinfeld Defames Lapine on National Television**

25.     Upon release of the Infringing Work in early October 2007, Jessica Seinfeld

launched a national promotional campaign, appearing on such popular television programs as

The Oprah Winfrey Show and Live with Regis and Kelly.  The Infringing Work received

favorable reviews and became a best seller.

26.     In light of the substantial similarity between the Book and the Infringing Work,

within weeks of publication of the Infringing Work, numerous statements were made on the

Internet and in print and television media that Jessica Seinfeld had plagiarized the Book.

27.     On October 29, 2007, to deflect attention from the mounting public accusations of

plagiarism against his wife, defendant Jerry Seinfeld used an appearance on the immensely

popular CBS television program, <u>Late Show With David Letterman</u>, to launch a malicious, premeditated and knowingly false and defamatory attack, uttering egregiously false and reprehensible statements about Lapine.

28.     In that appearance, Jerry Seinfeld stated that Lapine was a mentally unbalanced celebrity stalker who falsely concocted accusations of plagiarism to thrust herself into the limelight and harass the Seinfelds.  Jerry Seinfeld stated that Lapine was an "angry" and "hysterical" "wacko" who had been "waiting in the woodwork" to "spring out" and "go wacko" on the Seinfelds.  Seinfeld stated that Lapine was similar to the "wackos" who had victimized Letterman in two widely publicized and harrowing episodes several years ago.  To bring home the point that Lapine was a mentally unhinged stalker of the Seinfelds, Jerry Seinfeld further suggested that Lapine could be an "assassin."

29.     Seinfeld's slanderous attack on Lapine included, among others, the following statements uttered before a national television audience.

David Letterman:  And speaking of mother, the mother of your child, uh, children, your wife, big cookbook, congratulations on the cookbook.

Jerry Seinfeld:  Thank you very much, yes, my wife has a very big cookbook, but --

Letterman:  What's the name of the cookbook?

Seinfeld:  -- the cookbook is called, uh, *Deceptively Delicious*, but there is a cookbook controversy, now you know --

Letterman:  What do you mean?

Seinfeld:  -- I don't like to come on the show without some controversy brewing, where I can inject myself --

* * *

15

Seinfeld: .... So, um, now my wife likes to cook, so she comes up with this thing where she's pureeing vegetables and she's putting them in the kid's food, and the kids, so they get like better nutrition, and she's doing this and then her friends start doing it, and then she has two sisters and they have kids, and they start doing it. So they're passing all these recipes around. So somebody says to her, you should put these recipes into a cookbook, make a cookbook.

Letterman: Right. Excellent idea.

Seinfeld: Because it's healthy and we, the fat kids and the obesity, and it's a positive, positive thing.

Letterman: It's a serious problem. Sure.

Seinfeld: So she makes the cookbook, everybody is happy, it does well, seemingly an innocent sequence of events.

Letterman: Mmm.

Seinfeld: *Now you know, having a career in show business, one of the fun facts of celebrity life is, wackos will wait in the woodwork to pop out at certain moments of your life to inject a little adrenalin into your life experience.*

Letterman: Yes, just a little tap to get your attention.

Seinfeld: *Yes, I have wackos, you have had wackos. I believe your wackos are very well documented.*

Letterman: Heh, yeah. Uh, yes. That's one good thing. You got all the paperwork.

Seinfeld: *Now, if you're any good as a woodwork wacko, you are patient. You wait. You pick your moment and then you spring out and go wacko. So, there's another woman who had another cookbook. And it was a similar kind of thing with the food, and the vegetables in the food, and uh, my wife never saw the book, read the book, used the book.*

Letterman: Knew nothing about it.

Seinfeld: Didn't know anything about it. *But the books came out at the same time.*

Letterman: Mm hmm.

16

Seinfeld: *So this woman says, "I sense this could be my wacko moment."*

Letterman: Ahhh. Oh.

Seinfeld: *So she comes out and she says, and she accuses my wife, she says, you stole my mushed-up carrots. You can't put mushed-up carrots in a casserole, I put mushed-up carrots in the casserole. It's vegetable plagiarism.*

Letterman: It's ridiculous.

* * *

Letterman: . . . . And what does this woman think, that she's the first one to prepare and eat food?

Seinfeld: *I, I guess so. And I'm more upset, we're sorry that she is, you know, angry and hysterical, and because she's a three-name woman, which is what concerns me. She has three names.*

Letterman: Oh, mmm.

Seinfeld: *And you know, if you read history, many of the three-name people do become assassins.*

Letterman: Yeah, yeah. Now, um --

Seinfeld: *Mark David Chapman. And you know, James Earl Ray. So, that's my concern.*

30.    Jerry Seinfeld's statements on the <u>Letterman</u> program stated, expressly and by inference, implication and insinuation, that Lapine is a mentally unhinged celebrity stalker who poses a potentially violent threat to the Seinfelds, and that she falsely concocted accusations of plagiarism against Jessica Seinfeld. A reasonable person watching Jerry Seinfeld on the <u>Letterman</u> program necessarily would conclude that Jerry Seinfeld had imputed to Lapine mental illness and potentially violent or, at a minimum, hostile, tendencies, proclivities and activities.

31.     For example, when Jerry Seinfeld told Letterman, *"I have wackos, you have had wackos. I believe your wackos are very well documented,"* Seinfeld was referring to two stalking episodes involving Letterman that received extensive national press coverage. One such episode, which occurred in the late 1990s, involved Margaret Mary Ray, a woman diagnosed with schizophrenia who repeatedly broke into Letterman's home. The other widely-publicized episode involved a 2005 plot to kidnap Letterman's infant son and hold him hostage for a $5 million ransom.

32.     On the same day he appeared on <u>Late Show With David Letterman</u>, Jerry Seinfeld also appeared on <u>E! News</u>, broadcast on the E! network. Seinfeld used his appearance on that program again to make outrageously false statements about Lapine's mental health, stating that she was a "nutjob" who had seized upon the cookbook controversy to extort money from the Seinfelds:

> Host: Your wife has done such great philanthropy work over the years, especially with children. There's lots of controversy now around her book. Is she unfairly being criticized? That's right. Yeah, exactly. And what does this woman think, that she's the first one to prepare and eat food?
>
> Seinfeld: *As a celebrity, I enjoy the fact that whenever you do something; some nut job comes out of the woodwork and gets hysterical. I know the truth that nothing ever happened. I don't know if you know the story about the guy I went to college with who claimed I stole the whole TV series from him, and he sued me for 100 million dollars. So this woman is another kind of nut. You know, she thinks she invented vegetables. And she's accusing my wife of stealing <u>her</u> mashed-up carrots.*

33.     Jerry Seinfeld's statements on the <u>E! News</u> program stated, expressly and by inference, implication and insinuation, that Lapine is a mentally unhinged celebrity stalker who seized upon the cookbook controversy to concoct false accusations of copying to extort money from the Seinfelds. A reasonable person watching Jerry Seinfeld on <u>E! News</u> necessarily would

conclude that he, directly and by implication, had imputed to Lapine mental illness and a tendency and proclivity to lie and extort.

34.    The statements uttered by Jerry Seinfeld about Lapine, as described above, are entirely false.  Lapine does not suffer from any mental infirmity; she is not a celebrity stalker; she is not a violent or dangerous person; she did not and does not engage in extortion; she is not a liar; she did not, until the filing of this complaint, make any specific accusations against Jessica Seinfeld (although she had more than ample grounds to do so); she did not fabricate accusations against Jessica Seinfeld to gain media attention, enrich herself or harass the Seinfelds; and she was not lying in wait for an opportunity to become embroiled in a controversy with any celebrity -- much less the Seinfelds.

35.    Lapine is not a public figure, but even if Lapine were to be considered a public figure for the purposes of her defamation cause of action, Jerry Seinfeld knew or recklessly disregarded that his defamatory statements about Lapine were false.

36.    Jerry Seinfeld's defamatory statements about Lapine have caused and are continuing to cause Lapine severe damage.

First Claim for Relief
On Behalf of Plaintiff Missy Chase Lapine

(Copyright Infringement under 17 U.S.C. §§ 101 et seq. --
Against Defendant Jessica Seinfeld)

37.    Plaintiff Missy Chase Lapine repeats and realleges the allegations of paragraphs 1 through 36.

38.    The Book contains a substantial amount of material wholly original with Lapine and copyrightable subject matter under the laws of the United States.  The expression, presentation, arrangement, structure and organization of the Book's content, as well as the Book's explanations, descriptions, phrases, philosophies, recipes, "sneaky tips," methods, solutions, premise, styling and designs were the result of Lapine's original, creative and independent authorial judgment.  The Book's components are expressed by Lapine in a sequence, order, arrangement, organization and structure selected by, and original to, Lapine.

39.    Since February 2006, Lapine has been, and is, the sole proprietor of all right, title, and interest in and to the copyright in the Book.

40.    At all times relevant hereto, all copies of the Book made by Lapine or under her authority or license in the United States and elsewhere have been printed in strict conformity with the Copyright Act of the United States and all other laws governing copyright in the areas where the Book has been published.

41.    Lapine has conveyed no copyright interest in the Book or any edition thereof to HarperCollins or Jessica Seinfeld.

20

42.    Defendant Jessica Seinfeld incorporated Lapine's original expression, arrangement, presentation, structure, methods, phrases, philosophies, designs, styling, descriptions, organization, structure, premise, and recipes, incorporating significant elements of the Book's copyrightable, original expression into the Infringing Work.

43.    As a result of defendant Jessica Seinfeld's infringement of Lapine's copyright, the Infringing Work and the Book, are substantially similar.

44.    Jessica Seinfeld has earned revenues from producing, promoting, distributing and otherwise exploiting the Infringing Work.

45.    Jessica Seinfeld, with knowledge of Lapine's ownership of the copyright in the Book, willfully infringed Lapine's rights by producing, promoting, distributing and otherwise exploiting the Infringing Work.

46.    As a direct and proximate result of Jessica Seinfeld's conduct, Lapine has been damaged in an amount to be determined at trial.

Second Claim for Relief
On Behalf of Both Plaintiffs

(Trademark Infringement under Lanham Act §§ 32 and 43(a) --
Against Defendant Jessica Seinfeld)

47.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 36.

48.    Plaintiffs are the sole proprietors of all right, title and interest in The Sneaky Chef word and image trademarks.

49.    Lapine first used The Sneaky Chef word and image trademarks in commerce in connection with her business in or about February 2007.  The image trademark contains a line-

21

drawn caricature image of a female chef winking, holding a finger to her lips as if to say "shhh, and hiding carrots behind her back.

50.     Subsequently, Lapine initiated the registration process for both the "Sneaky Chef" word trademark and the above-described image trademark.  On December 25, 2007, the United States Patent and Trademark office issued Lapine Registration No. 3360525 related to the word trademark.  Additional registration applications: Serial No. 77315353, as related to the word trademark, and Serial Nos. 77254965 and 77336128, as related to the image trademark, are pending.

51.     By virtue of the Book's sales and promotion, as well as the distinctive appearance and nature of The Sneaky Chef word and image trademarks, the trademarks have acquired a secondary meaning attributable to plaintiffs.  Lapine's education, expertise and years of effort in improving the diets and health of American children and the culinary arts have contributed to the credibility and goodwill fostered in the trademarks.

52.     Jessica Seinfeld (who has no education, expertise or experience concerning children's nutrition or culinary arts) has, in bad faith, adopted a confusingly similar mark, making use, on the Infringing Work's cover, of a line-drawn caricature of a female chef preparing food, winking, while hiding carrots behind her back.  An additional image appears on the spine of the Infringing Work and on Jessica Seinfeld's Web site containing a line-drawn image of a female holding a finger to her lips as if to say "shhh."

53.     The above-described elements of the Infringing Work are designed and conceived to mislead the public into associating the Infringing Work with the Book, and are likely to cause consumer confusion, initial interest confusion, mistake and deception of the public as to the

identity and origin of plaintiffs' goods, and as to any affiliation or relationship between the two works and parties, causing irreparable harm to plaintiffs.

54.    The Infringing Work has been advertised, sold and distributed in interstate commerce.

55.    As a direct and proximate result of Jessica Seinfeld's conduct, plaintiffs have been damaged in an amount to be determined at trial.

Third Claim for Relief
On Behalf of Both Plaintiffs

(Trademark Infringement under N.Y. Gen. Bus. Law § 360-k --
Against Defendant Jessica Seinfeld)

56.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 36 and 48 through 53.

57.    Jessica Seinfeld has used and continues to use, without plaintiffs' consent, a colorable imitation of The Sneaky Chef trademark in connection with the sale, distribution, offering for sale, or advertising of the Infringing Work.

58.    Jessica Seinfeld's improper and bad-faith use of a confusingly similar mark is likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services.

59.    Jessica Seinfeld intended to cause confusion or mistake or to deceive as to the source of origin of such goods or services.

60.    As a direct and proximate result of Jessica Seinfeld's conduct, plaintiffs have been damaged in an amount to be determined at trial.

23

Fourth Claim for Relief
On Behalf of Both Plaintiffs

(Injury to Business Reputation under N.Y. Gen. Bus. Law § 360-l --
Against Defendant Jessica Seinfeld)

61.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 36, 48 through 53 and 57 through 59.

62.    Jessica Seinfeld's use of a confusingly similar trademark injures and creates a likelihood of injury to plaintiffs' business reputation because persons encountering Jessica Seinfeld and her products and services will believe that Jessica Seinfeld is affiliated with or related to or has the approval of plaintiffs.

63.    Any adverse reaction by the public to Jessica Seinfeld and the quality of her products and the nature of her business will injure the business reputation of plaintiffs and the goodwill that they enjoy in connection with The Sneaky Chef trademark, goods and services.

64.    As a direct and proximate result of Jessica Seinfeld's conduct, plaintiffs have been damaged in an amount to be determined at trial.

Fifth Claim for Relief
On Behalf of Plaintiff Missy Chase Lapine

(Slander and Slander Per Se --
Against Defendant Jerry Seinfeld)

65.    Plaintiff Missy Chase Lapine repeats and realleges the allegations of paragraphs 1 through 36.

66.    Jerry Seinfeld's false statements about Lapine constitute slander and/or slander per se.

24

67.    Jerry Seinfeld's false and defamatory statements were made with malice, as such statements were made by Jerry Seinfeld with knowledge of their falsity or with reckless disregard for their falsity.

68.    As a proximate result of Jerry Seinfeld's false and defamatory statements, Lapine has suffered injury, including pecuniary loss, in an amount to be determined at trial.

69.    Because Jerry Seinfeld's made his false and defamatory statements described above knowingly, willfully, maliciously and in conscious disregard of Lapine's rights, Lapine is entitled to an award of punitive damages in an amount to be determined at trial.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs respectfully request that judgment be entered:

(1)    On the First Claim for Relief, against defendant Jessica Seinfeld and in favor of Plaintiff Missy Chase Lapine:

(a)    awarding, pursuant to 17 U.S.C. § 504(b), actual damages and disgorgement of all profits attributable to the Infringing Work, including, but not limited to, all profits from (i) distributing the Infringing Work for domestic and international release; and (ii) otherwise exploiting the Infringing Work through licensing, merchandising or other means; and

(b)    awarding, pursuant to 17 U.S.C. § 504(c), statutory damages;

(2)    On the Second Claim for Relief, against defendant Jessica Seinfeld and in favor of plaintiff Missy Chase Lapine and The Sneaky Chef, Inc., awarding, pursuant to § 35 of the

25

Lanham Act, 15 U.S.C §§ 1117(a) damages, as well as disgorgement of all profits attributable to the Infringing Work, including, but not limited to, all profits from (i) distributing the Infringing Work for domestic and international release; and (ii) otherwise exploiting the Infringing Work through licensing, merchandising or other means;

(3)    On the Third Claim for Relief, against defendant Jessica Seinfeld and in favor of plaintiffs Missy Chase Lapine and The Sneaky Chef, Inc., awarding, pursuant to N.Y Gen. Bus. Law § 360-m, actual damages and disgorgement of all profits attributable to the Infringing Work, including, but not limited to, all profits from (i) distributing the Infringing Work for domestic and international release; and (ii) otherwise exploiting the Infringing Work through licensing, merchandising or other means; as well as multiple damages in the amount of three times the damages suffered by plaintiffs, pursuant to N.Y Gen. Bus. Law § 360-m;

(4)    On the Fourth Claim for Relief, against defendant Jessica Seinfeld and in favor of plaintiffs Missy Chase Lapine and The Sneaky Chef, Inc., awarding, pursuant to N.Y Gen. Bus. Law § 360-m, actual damages and disgorgement of all profits attributable to the Infringing Work, including, but not limited to, all profits from (i) distributing the Infringing Work for domestic and international release; and (ii) otherwise exploiting the Infringing Work through licensing, merchandising or other means; as well as multiple damages in the amount of three times the damages suffered by plaintiffs, pursuant to N.Y Gen. Bus. Law § 360-m;

(5)    On the Fifth Claim for Relief, against defendant Jerry Seinfeld and in favor of plaintiff Missy Chase Lapine, awarding compensatory and punitive damages in amounts to be determined at trial;

(6)    Awarding plaintiffs their costs, expenses, interest and reasonable attorneys' fees;

(7)    Granting such other and further relief as this Court deems just and proper.

Dated: January 7, 2008
       New York, New York

KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP

By: _____

Marc E. Kasowitz (MK 2597)
mkasowitz@kasowitz.com
Daniel R. Benson (DB 6587)
dbenson@kasowitz.com
Mark P. Ressler (MR 4985)
mressler@kasowitz.com
Maria Gorecki (MG 3205)
mgorecki@kasowitz.com
Rachel E. Lubert (RL 1563)
rlubert@kasowitz.com

1633 Broadway
New York, NY 10019
Phone: (212) 506-1700
Fax:    (212) 506-1800

Attorneys for Plaintiffs
Missy Chase Lapine and The Sneaky Chef, Inc.

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------- x

MISSY CHASE LAPINE and THE SNEAKY CHEF, INC.,   :

                   Plaintiffs,       :

       -against-            :

JESSICA SEINFELD and JERRY SEINFELD,   :

                 Defendants.     :

                         :

------------------------------------------------------------------------- x

ECF Case

No. 08-CV-128 (LTS)

**ANSWER OF DEFENDANTS
JESSICA SEINFELD and
JERRY SEINFELD**

     Defendants Jessica Seinfeld and Jerry Seinfeld, by their attorneys Cowan, Liebowitz &
Latman, P.C. and Menaker & Herrmann LLP, denying the allegations of the Complaint for
copyright infringement, trademark infringement, injury to business reputation and slander, for
their answer to the Complaint state as follows:

     1.     State that this action gives new meaning to the terms "objectively unreasonable"
and "publicity stunt."  Admit that Plaintiff Lapine's book *The Sneaky Chef:  Simple Strategies
for Hiding Healthy Foods in Kids' Favorite Meals* ("*Sneaky Chef*") was first published in
paperback in April 2007.  Deny that *Sneaky Chef* reflects a "unique and innovative approach to
improving children's eating habits."  Deny knowledge or information sufficient to form a belief
as to the truth of the remaining allegations in paragraph 1.

     2.     Admit that Defendant Jessica Seinfeld's book *Deceptively Delicious:  Simple
Secrets to Getting Your Kids Eating Good Food* ("*Deceptively Delicious*") was published on or
about October 5, 2007, and became a commercial success, in late October 2007 reaching

Number 1 on the hardcover New York Times Advice, How-To and Miscellaneous list. Deny the remaining allegations in paragraph 2.

3.     Deny the allegations in paragraph 3, except admit that on or about October 29, 2007, Jerry Seinfeld appeared on *The Late Show With David Letterman* and refer to the transcript of that show for what was said.

4.     Deny the allegations in paragraph 4, and state that anyone hearing Jerry Seinfeld's remarks concerning the allegations of "vegetable plagiarism" would readily have recognized that he was not making statements of fact but overstatements of opinion for comic effect.

5.     Admit that Jerry Seinfeld is a well-known comedian, and that Jessica Seinfeld is his wife. Deny the remaining allegations in paragraph 5.

6.     Do not contest this Court's jurisdiction, as alleged in paragraph 6.

7.     Do not contest this Court's venue, as alleged in paragraph 7.

8.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8.

9.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9.

10.     Admit the allegations in paragraph 10.

11.     Admit the allegations in paragraph 11.

12.     Admit the allegations in paragraph 12.

2

13.    Deny that "camouflag[ing] healthy foods so that children will eat them without realizing or objecting" is "original" to Lapine.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 13.

14.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14.

15.    Admit that in or about late May 2006 an approximately 100-page proposal was submitted to HarperCollins and was rejected.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 15.

16.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16.

17.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17.

18.    Admit the allegations in paragraph 18.

19.    Deny the allegations in paragraph 19.

20.    Admit that in July 2007 a representative of Running Press contacted HarperCollins.  Deny the remaining allegations in paragraph 20.

21.    Admit the allegations in paragraph 21, and state that the letter referred to, which speaks for itself, states in addition to the language quoted by Plaintiffs, "Any similarities between the two books stem from their shared subject matter. ... The idea of sneaking healthy foods into a child's diet is not original to your author (see, for example, the monthly column in COOKIE Magazine titled 'Sneak It In'), nor is the concept of creating purees in order to do so. Beyond this basic idea – which, of course, is not protected by copyright law – the books differ

3

greatly.  I simply do not agree that they are similar in terms of style, design, organization or 'look and feel.'"

22.    Admit that *Deceptively Delicious* was published in October 2007 with the subtitle "Simple Secrets to Get Your Kids Eating Good Food."  Deny the remaining allegations in paragraph 22.

23.    Deny the allegations in paragraph 23.  Respectfully refer the Court to the books, which speak for themselves; and state that the "content," "artwork," "expression," "methodology," "organization" and "structure" of *Deceptively Delicious* are substantially dissimilar to, and its "design, styling and look and feel" are strikingly different from, *Sneaky Chef* as a matter of law.

24.    Deny that Jessica Seinfeld has "infringed," and deny that anything in *Deceptively Delicious* is "copied" from *Sneaky Chef*.  Deny that such matter as "concept," "philosophy," "premise," "approach," and "methodology" is protectible by copyright.  17 U.S.C. § 102(b).

As to the specific allegations in subparagraphs (a)-(v) of the Complaint, respectfully refer the Court to the parties' books, which speak for themselves, and which are quoted or characterized incorrectly and/or out of context in subparagraphs (a)-(v) of the Complaint. Plaintiffs' allegations of actionable similarity under the federal Copyright Act in subparagraphs (a)-(v) consist largely of citations of paired short passages of text that are in every case substantially dissimilar as to expression, with only scattered words or word fragments in common; for the most part even the unprotectible ideas expressed are dissimilar.  Even the unprotectible words and word fragments Plaintiffs emphasize (e.g., "*table*") are commonplace, even inevitable, in works with similar subject matter, i.e., cookbooks and books about childhood nutrition.

4

Worse yet, the purported "quotations"—tellingly, Plaintiffs provide no page numbers for the passages purportedly quoted or characterized—that make up Plaintiffs' copyright infringement claim are riddled with inaccuracies, and some are manufactured entirely.

For example, subparagraph 24(e) of the Complaint alleges "Both the Book and the Infringing work characterize the author's solution as an *'epiphany'* and state the benefits that accompany nutritional camouflage." (emphasis in Complaint). The allegation in subparagraph 24(e) is (A) false, for <u>neither</u> book characterizes anything as an "epiphany"; and (B) irrelevant, for neither Lapine nor anyone else could claim an exclusive right under copyright to "characterize the author's solution as an *'epiphany'* and state the benefits that accompany nutritional camouflage."

Subparagraph 24(f) alleges "The Book states: 'It got our ***whole family*** eating together in peace.'"; and "The Infringing [sic] states: '[T]he ***whole family*** is happier and we can finally enjoy mealtimes again.'" (emphasis in Complaint). The claim is frivolous on its face; the cited sentences are substantially dissimilar, having only the two-word phrase "whole family" in common. It is also falsified. The italicized, boldfaced phrase "whole family" (*Deceptively Delicious*, p.11) allegedly copied from *Sneaky Chef* does not even appear in *Sneaky Chef*, which states, at page 28, "It got our family eating together in peace."

Subparagraph 24(v) of the Complaint alleges that "Both the Book and the Infringing Work suggest adding the same specific fruit or vegetable puree to the same dishes, as set forth below." Lapine's claim to own a copyright in the suggested use of a single ingredient—in recipes which are themselves uncopyrightable—is frivolous on its face. Even worse, Lapine's specific representations to the Court in subparagraph 24(v) misrepresent and outright falsify the works at issue. A few examples:

5

- Plaintiffs claim copyright infringement based on both books' allegedly "suggesting" adding "White Bean" puree to "Chocolate Chip Cookies." The claim is frivolous and false. *Sneaky Chef*, pp.236-37, specifies "White Bean Puree" (pureed "great northern, navy, butter or cannelloni" beans, *id*. p.112) for its "Unbelievable Chocolate Chip Cookies"; however, *Deceptively Delicious*'s "Chocolate Chip Cookies" recipe, p.177, specifies canned chickpeas—and <u>not</u> pureed, but "drained and rinsed."

- Plaintiffs represent to the Court that both books "suggest" adding "Cauliflower" puree to "Twice-Baked Potatoes." *Sneaky Chef*, however, does not even contain a recipe for twice-baked potatoes—a fact clearly within Plaintiffs' knowledge. Two potato recipes in *Sneaky Chef* ("No Sin Potato Skins," p.184, and "Mystery Mashed Potatoes," p.228) specify not "Cauliflower" but "White Puree" (made of zucchini, cauliflower and lemon juice, *id*. pp.102-03). Another, "Triple-Stuffed Potatoes," p.194-95, specifies either "White Puree" or "White Bean Puree" (i.e., "great northern, navy, butter or cannelloni" beans, *id*. p.112). *Deceptively Delicious* specifies "cauliflower puree" in its "Twice Baked Potatoes" recipe, p.139.

Claiming copyright infringement based on trivial and unprotectible aspects of Plaintiffs' work is objectively unreasonable. Falsifying and misrepresenting both parties' works in the process is inexcusable. Such allegations and contentions, which are both false and without evidentiary support in the only place such support could be found—the works themselves—are irresponsible and indeed sanctionable under 17 U.S.C. § 505 and Fed. R. Civ. P. 11(b). Even as manufactured, misquoted and presented out of context they reflect no actual copying, much less actionable copying. Deny the remaining allegations in paragraph 24.

25.    Deny that *Deceptively Delicious* is an "Infringing Work." Deny that Jessica Seinfeld "launched" a national promotional campaign. Admit the remaining allegations in paragraph 25.

26.    Deny the allegations in paragraph 26.

27.    Deny the allegations in paragraph 27, except admit that Jerry Seinfeld appeared on *The Late Show With David Letterman* on or about October 29, 2007.

28.    Deny the allegations in paragraph 28 and refer to the transcript of the show for what was said.

29.    Deny the allegations in paragraph 29, except admit that Jerry Seinfeld made overstatements of opinion for comic effect, and refer to the complete transcript of the show for what was said.

30.    Deny the allegations in paragraph 30.

31.    Deny the allegations in paragraph 31, except admit that Jerry Seinfeld made comic remarks about both his and David Letterman's experiences with individuals whose actions impinged on their off-camera lives.

32.    Deny the allegations in paragraph 32.

33.    Deny the allegations in paragraph 33.

34.    Deny the allegations in paragraph 34, except admit that Jerry Seinfeld made overstatements of opinion for comic effect.

35.    Deny the allegations in paragraph 35.

36.    Deny the allegations in paragraph 36.

22160/003/819499.6

**As to Plaintiff Missy Chase Lapine's First Claim for
Relief (Alleged Copyright Infringement Under the
Copyright Act, 17 U.S.C. § 101 *et seq.*)**

37.     Repeat paragraphs 1 through 36 of this Answer.

38.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 38.

39.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39.

40.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40.

41.     Admit the allegations in paragraph 41.

42.     Deny the allegations in paragraph 42.

43.     Deny the allegations in paragraph 43.

44.     Deny that *Deceptively Delicious* is an "Infringing Work." Admit that Jessica Seinfeld has received royalties from sales of *Deceptively Delicious*. Deny the remaining allegations in paragraph 44.

45.     Deny the allegations in paragraph 45.

46.     Deny the allegations in paragraph 46.

**As to Plaintiffs' Second Claim for Relief (Alleged
Trademark Infringement Under Lanham Act §§ 32 and
43(a), 15 U.S.C. §§ 1114, 1125)**

47.     Repeat paragraphs 1 through 36 of this Answer.

8

48.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48.

49.     State that Plaintiffs' alleged "image trademark" speaks for itself.  Deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 49.

50.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 50.

51.     Deny the allegations in paragraph 51.

52.     Deny the allegations in paragraph 52.

53.     Deny the allegations in paragraph 53.

54.     Deny that *Deceptively Delicious* is an "Infringing Work."  Admit the remaining allegations in paragraph 54.

55.     Deny the allegations in paragraph 55.

## As to Plaintiffs' Third Claim for Relief (Alleged Trademark Infringement Under N.Y. Gen. Bus. Law § 360-k)

56.     Repeat paragraphs 1 through 36 and 48 through 53 of this Answer.

57.     Deny the allegations in paragraph 57.

58.     Deny the allegations in paragraph 58.

59.     Deny the allegations in paragraph 59.

60.     Deny the allegations in paragraph 60.

9

### As to Plaintiffs' Fourth Claim for Relief (Alleged Injury to Business Reputation/Dilution Under N.Y. Gen. Bus. Law § 360-1)

61.    Repeat paragraphs 1 through 36, 48 through 53, and 57 through 59 of this Answer.

62.    Deny the allegations in paragraph 62.

63.    Deny the allegations in paragraph 63.

64.    Deny the allegations in paragraph 64.

### As to Plaintiff Missy Chase Lapine's Fifth Claim for Relief (Alleged Slander and Slander *Per Se*)

65.    Repeat paragraphs 1 through 36 of this Answer.

66.     Deny the allegations in paragraph 66.

67.    Deny the allegations in paragraph 67.

68.    Deny the allegations in paragraph 68.

69.    Deny the allegations in paragraph 69.

### As to the Relief Demanded

70.    Plaintiffs are not entitled to any of the relief demanded.

### Affirmative and Other Defenses

71.    The Complaint (and each of its claims) fails to state a claim on which relief can be granted.

22160/003/819499.6

72.     Defendant Jessica Seinfeld's original work *Deceptively Delicious* was independently created.

73.     Defendant Jessica Seinfeld's original work *Deceptively Delicious* is not similar, let alone "substantially similar," to Plaintiffs' work *Sneaky Chef*, and does not copy from it or take any protected or copyrightable expression from it.

74.     Although no use was made of Plaintiffs' work, any such use as Plaintiffs claim was made would be non-actionable as fair use under Section 107 of the Copyright Act, 17 U.S.C. § 107.

75.     Plaintiffs' actions, including the commencement of this litigation, constitute copyright misuse.

76.     Plaintiffs' claims are barred, in whole or in part, by the doctrines of laches, estoppel and/or waiver.

77.     Under Section 412(1) of the Copyright Act, 17 U.S.C. § 412(1), Plaintiffs are barred from the recovery of statutory damages and attorneys' fees (as provided by Sections 504 and 505 of the Copyright Act, 17 U.S.C. §§ 504, 505) because Missy Chase Lapine's copyright claim in *Sneaky Chef* was not registered prior to the commencement of the alleged infringement or within 90 days of the first publication of *Sneaky Chef*.

78.     Plaintiffs do not own any valid trademark or trade dress that has been used or infringed by defendant Jessica Seinfeld.

79.     Plaintiffs are barred from relief or recovery under N.Y. Gen. Bus. Law §§ 360-k and 360-m, because Plaintiffs' putative trademarks have not been registered with the Secretary of State of New York under N.Y. Gen. Bus. Law §§ 360-a-j.

80.     The recovery of damages and profits Plaintiffs seek under the New York Anti-Dilution Statute, N.Y. Gen. Bus. Law § 360-1, is unavailable under that provision.

81.     Since plaintiff Lapine is a public figure, she cannot assert a valid claim for relief for slander because the remarks complained of were made without malice.

82.     The remarks complained of were not statements of fact, but overstatements of opinion.

83.     The remarks complained of constituted rhetorical hyperbole.

84.     The remarks complained of are subject to qualified privilege.

22160/003/819499.6

WHEREFORE, Jessica Seinfeld and Jerry Seinfeld demand judgment as follows:

A.    Ordering that plaintiffs take nothing by way of their Complaint;

B.    Dismissing the Complaint with prejudice;

C.    Awarding Jessica Seinfeld and Jerry Seinfeld their costs and attorneys' fees herein; and

D.    Granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
        February 22, 2008

                                        ___s/ Richard Dannay_____
                                        Richard Dannay (rxd@cll.com)
                                        Thomas Kjellberg (txk@cll.com)
                                        COWAN, LIEBOWITZ & LATMAN, P.C.
                                        1133 Avenue of the Americas
                                        New York, New York 10036-6799
                                        Phone (212) 790-9200
                                        Fax (212) 575-0671


                                        ___s/ Richard G. Menaker_____
                                        Richard G. Menaker (rmenaker@mhjur.com)
                                        Cheryl L. Davis (cdavis@mhjur.com)
                                        MENAKER & HERRMANN LLP
                                        10 East 40th Street
                                        New York, New York 10016
                                        Phone (212) 545-1900
                                        Fax (212) 545-1656

                                        Attorneys for Defendants
                                        Jessica Seinfeld and Jerry Seinfeld


TO:
Christopher A. Seeger, Esq.
David R. Buchanan, Esq.
SEEGER WEISS LLP
One William Street Suite 10
New York, New York 10004
Attorneys for Plaintiffs

13

# Exhibit C

Howard B. Miller, Esq. (Admitted *Pro Hac Vice*)
Amanda L. McClintock, Esq. (Admitted *Pro Hac Vice*)
Joseph C. Gjonola, Esq. (Admitted *Pro Hac Vice*)
GIRARDI | KEESE
1126 Wilshire Boulevard
Los Angeles, CA 90017
Tel. (213) 977-0211
Fax (213) 481-1554

Christopher A. Seeger, Esq.
David R. Buchanan, Esq.
SEEGER WEISS LLP
One William Street
New York, NY 10004
Tel. (212) 584-0700
Fax (212) 584-099

Attorneys for Plaintiffs Missy Chase Lapine and
The Sneaky Chef, Inc.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

| | |
|---|---|
| MISSY CHASE LAPINE, and THE SNEAKY CHEF, Inc., | ECF CASE |
| : | Civil Action No.: 08-CV-00128 (LTS) |
| Plaintiffs, : | |
| v. : | **FIRST AMENDED COMPLAINT** |
| JESSICA SEINFELD, JERRY SEINFELD, HARPERCOLLINS PUBLISHERS, INC., and DEPARTURE PRODUCTIONS, LLC, : | **Jury Trial Demanded** |
| Defendants. : | |

------------------------------------------------------- x

Plaintiffs Missy Chase Lapine and The Sneaky Chef, Inc., in this first

amended complaint against defendants Jessica Seinfeld and Jerry Seinfeld,

1

add defendants HarperCollins and Departure Productions, and allege as
follows:

## PRELIMINARY STATEMENT

1.    This action is for copyright infringement , trademark infringement,
unfair competition, injury to business reputation, breach of contract, and
defamation.  In April 2007, plaintiff Missy Chase Lapine ("Lapine"), based
on years of research, published The Sneaky Chef: Simple Strategies for
Hiding Healthy Foods in Kids' Favorite Meals (the "Book" or "The Sneaky
Chef").  The Sneaky Chef achieved immediate critical acclaim and
commercial success for its unique and innovative approach to improving
children's eating habits by, among other things, camouflaging purees of
carefully selected fruits and vegetables (like spinach and sweet potato) as
ingredients in unhealthy or less healthy food desired by children, like
cheeseburgers, grilled cheese sandwiches and brownies.

2.    Prior to securing her book with publisher Running Press, an
imprint of Perseus Books Group ("Perseus"), Lapine twice submitted
substantial parts of her manuscript to HarperCollins Publishers
("HarperCollins") for consideration.  HarperCollins read and retained
possession of her submissions. HarperCollins turned down the opportunity
to publish Lapine's book on both occasions.

2

3.     In October 2007, six months after Lapine's Book was published, defendant HarperCollins and defendant Jessica Seinfeld published and authored Deceptively Delicious: Simple Secrets to Getting Your Kids Eating Good Food (the "Infringing Work" or "Deceptively Delicious"), which brazenly plagiarized The Sneaky Chef, and misappropriated the Book's trademark – a caricature of a winking chef holding a finger to her lips (as if to say "shhh") and hiding carrots behind her back. Defendant Departure Productions, LLC ("Departure"), claims copyright in the Infringing Work. Fueled by a massive, celebrity-driven marketing campaign, Jessica Seinfeld's book became a commercial success, climbing to the top of The New York Times best seller list.

4.     Jessica Seinfeld's success was accompanied by accusations on the Internet and in the media that, based on the striking and substantial similarities between the two books, Jessica Seinfeld had plagiarized The Sneaky Chef.

5.     Seeking to deflect those accusations, and apparently not content that his wife had misappropriated Lapine's book, defendant Jerry Seinfeld, Jessica's husband, embarked on a national media campaign of malicious defamation against Lapine. On the Late Show With David Letterman , Jerry Seinfeld stated, among other things, that his wife's book came out "at the

3

same time" as Lapine's; that his wife "never saw" or "read" Lapine's book before hers was published; that Lapine was a "wacko" celebrity stalker who, like the infamous stalkers who had terrorized David Letterman and his family, "waited in the woodwork" to "spring out" and attack his wife; and that Lapine was an "angry and hysterical" woman who posed a potentially violent threat ("assassin") to the Seinfelds. Likewise, on E! News, Seinfeld referred repeatedly to Lapine as a "nut job" who had "come[] out of the woodwork" to attack his wife with false accusations of plagiarism.

6.     All of Jerry Seinfeld's statements were false and made recklessly and with malice. Jessica Seinfeld's book came out six months after Lapine's; Jessica Seinfeld saw and read t Lapine's Book before Jessica Seinfeld's was published; Lapine does not suffer from any mental infirmity; she is not a celebrity stalker; she is not a violent or dangerous person; she did not and does not engage in extortion; she is not a liar; she did not, until the filing of this complaint, make any specific accusations against Jessica Seinfeld; she did not fabricate accusations against Jessica Seinfeld to gain media attention, enrich herself or harass the Seinfelds; and she was not lying in wait for an opportunity to become embroiled in a controversy with any celebrity, including the Seinfelds.

4

7.    Defendants Jessica Seinfelds, HarparCollins and Departures' conduct violates federal and New York law.  Jerry Seinfeld's malicious, nationally televised attack on Lapine constitutes slander under New York law.

8.    Jessica Seinfeld plagiarized plaintiff's Book and infringed Lapine's trademark.  HarperCollins seized Lapine's property as embodied in her manuscript, and used her work in publishing Seinfeld's infringing work, all in violation of state and federal law.  HarperCollins currently publishes the Infringing work.  Departure Productions LLC, according to the Infringing Work's copyright page, owns the copyright in the Infringing Work.  Accordingly, Lapine brings this action to recover compensatory and punitive damages.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b) and 15 U.S.C. § 1121, as well as the doctrine of pendent jurisdiction.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as the claims arise, and defendants reside, in this district.

5

## **THE PARTIES**

11.    Plaintiff Missy Chase Lapine is a citizen of the State of New York and resides in Irvington, New York.

12.    Plaintiff The Sneaky Chef, Inc. is a corporation organized and existing under the law of the State of New York, with its principal place of business in Irvington, New York.

13.    Defendant Jessica Seinfeld is a citizen of the State of New York and resides in New York, New York.

14.    Defendant Jerry Seinfeld is a citizen of the State of New York and resides in New York, New York. Jerry Seinfeld is an enormously wealthy and well-known actor. From 1990 to 1998, he was the star of *Seinfeld*, one of the most popular programs in television history. He is married to defendant Jessica Seinfeld.

15.    Defendant HarperCollins Publishers, Inc. is a corporation organized and existing under the law of the State of Delaware, with its principal place of business in New York, New York.

16.    Defendant Departure Productions, LLC is a limited liability company organized and existing under the law of the State of New York, with its principal place of business in New York, New York. Departure claims copyright in the Infringing Work.

6

# FACTS

## Lapine Conceives of, Researches and Creates the Book

17.    Lapine's professional work has focused on food, nutrition and health.  She is the former publisher of Eating Well magazine and, before that, worked at Gourmet magazine. Lapine is certified in the master techniques of healthy cooking and was trained in classical cooking techniques by the Institute of Culinary Education. Lapine serves on the Culinary Arts Faculty of The New School in New York City; is a collaborator with the Alliance for a Healthier Generation, a partnership between the American Heart Association and the William J. Clinton Foundation devoted to helping schools serve healthier lunches; and serves on the Children's Advisory Council of Morgan Stanley Children's Hospital of New York-Presbyterian, where The Sneaky Chef nutrition techniques are used with pediatric patients.

18.    In or about 2002, Lapine began researching methods for getting children to eat healthier foods.  Spending her energy, time, and money, Lapine conducted numerous taste tests, focus groups and interviews, and consulted extensively with leading nutritionists, pediatricians and chefs.  Her research resulted in an innovative solution: camouflage healthy foods so that children will eat them without realizing or objecting.

7

19.    Through her own ingenuity, effort, and expense Lapine developed original methods for combining ingredients, including specially selected purees of vegetables that children typically resist, such as spinach or cauliflower, with dishes that children typically crave, such as brownies, pizza and pancakes.

20.    Lapine then prepared a manuscript of the Book that set forth Lapine's views on nutrition, child-rearing and American eating habits, as well as her explanation of the purees and how to put her methods to use.

21.    On or about February 6, 2006, Lapine sent a 139-page book proposal, which included extensive chapters from the Book manuscript, to HarperCollins. Four days later, a representative from William Morrow, an imprint of HarperCollins, sent Lapine a letter rejecting the proposal. In or about early May 2006, Lapine, through her literary agent, again submitted to HarperCollins her book proposal, again including extensive chapters from the Book manuscript. On May 24, 2006, HarperCollins rejected Lapine's second proposal, stating that "the children's food segment of the market is a tough one to navigate during a particularly tough time in the cookbook category in general. The influence of the food network and the availability of recipes online have really hurt this area. I'm sorry to say we'll be passing

. . . ."  HarperCollins retained possession of the material submitted by

Lapine.

Lapine Publishes the Book and Obtains Copyright and Trademark Protection

22.    In or about June 2006, Perseus, another book publisher, accepted

Lapine's proposal for the Book.  On or about August 1, 2006, Lapine and

Perseus entered into a contract for publication of the Book.

23.    On or about April 2, 2007, Perseus, through its Running Press

imprint, released the Book.  The reviews were extremely positive, with the

culinary press and general media lauding Lapine's revolutionary approach to

disguising healthy foods inside children's favorite dishes.  Within three

weeks of publication, the Book became a New York Times best seller.

24.    The Sneaky Chef, Inc. filed applications with the United States

Patent and Trademark Office for trademark registration of the word

trademark "Sneaky Chef" and the image trademark that appears on and in

the Book and on plaintiffs' Web site.  The Sneaky Chef, Inc. is the co-owner

with Lapine of all rights to the trademarks and is engaged, together with

Lapine, in developing and marketing books, DVDs and other products that

are based on Lapine's methods and concepts and utilize the trademarks.

25.    As part of a campaign to market and promote the Book, Lapine

appeared on the Today Show, Fox and Friends and numerous other

television programs; appeared on numerous national and local radio programs; was featured in national magazines such as Parenting and Women's Day and in numerous newspapers; and did a book tour throughout the country, which included bookstore and supermarket appearances and signings.

26.    During this book tour and marketing campaign, "The Sneaky Chef", and "shooshing" chef drawing, trademarks became well known and famous. The public began to associate those trademarks with Lapine's ideas and work embodied in her Book. Word of mouth began to spread about Lapine's book and technique. The trademarks, helped people identify Lapine's work.

Jessica Seinfeld Copies the Book, Notwithstanding a Cease And Desist Demand from Lapine and Her Publisher

27.    In or about May 2007, while promoting and marketing the Book, Lapine learned that Jessica Seinfeld and her publisher, HarperCollins, were planning to publish the Infringing Work. In an eight-page promotional brochure for the Infringing Work she received, Lapine observed blatant similarities between the Infringing Work and her Book, including, among other things, its cover design and content. Lapine immediately brought these similarities to the attention of her publisher.

28.    On or about July 9, 2007, seeking to prevent any violation of

Lapine's rights, Running Press brought to the attention of Jessica Seinfeld's

publisher the blatant similarities between the Book and the plans for the

Infringing Work (including the cover art, the subtitles, the organization and

the overall look and feel).

29.    On or about July 31, 2007, Jessica Seinfeld's publisher sent

Running Press a letter denying that Jessica Seinfeld copied, or was even

influenced by, the Book, asserting that the Infringing Work was "entirely

original to" Jessica Seinfeld, and stating that "we do not believe it necessary

or appropriate to make any changes to the design or content of [the

Infringing Work]."

Jessica Seinfeld Infringed Lapine's Copyright

30.    In October 2007, defendants infringed plaintiffs' copyright by

publishing and selling the Infringing Work which was copied from

plaintiffs' Book.

31.    As compared with its promotional flyer, the Infringing Work was

published with only minor and insignificant modifications to the cover art

and subtitle - the cover design of the Infringing Work was slightly altered by

moving the pictured carrots from their original position (held in the female

chef's hand behind her back, exactly where the chef in The Sneaky Chef

11

trademark holds her carrots) to a cutting board behind her back, and the Infringing Work's subtitle was slightly changed from "Sneaky Secrets to Get Your Kids Eating Good Food" to "Simple Secrets to Get Your Kids Eating Good Food."

32.    In writing and publishing the Infringing Work - which, in its content, artwork and overall look and feel, is substantially similar to the Book - defendants blatantly and willfully copied the Book's original concept, expression, methodology, organization, structure, design, styling and look and feel.  Defendants misappropriated Lapine's property as manifest throughout the Book manuscript and its recipes.  Defendants also infringed Lapine's trademark.  Defendants also represent that Lapine's protected expression and property originated with Seinfeld.

33.    Defendants' infringement consists of copying Lapine's protected original expression, philosophy, premise, approach, explanations, discussions, reflections, organization, methodology and overall look and feel, including (without limitation) the following respects:

(a) Both the Book and the Infringing Work contain introductions written by doctors calling attention to the growing problem of obesity in American children and the difficulties inherent in

12

providing sound nutrition to resistant children, and praising the

author for creative, clever and convenient solutions for parents.

(b) Both the Book and the Infringing Work state that children need

to feel a semblance of control over what they eat, while calling

attention to the connection between good nutrition and how

children behave and achieve. Both works discuss the dangers of

too much sugar in a child's diet (e.g., the sugar high and

ensuing crash). Both works address these issues by

recommending camouflaging carefully-selected pureed healthy

foods inside children's favorite foods.

(c) Both the Book and the Infringing Work begin with the author's

personal anecdote of mealtime struggles with her own picky

eaters. In fact, both works include a story about how one of the

author's children is a picky eater who influenced a non-picky

sibling to dislike food. Specifically, within that anecdote:

• the Book describes *"**begging**, pleading,*

*threatening, and bribing,"* as well as *"**coercing***

***kids to eat** what's on their plates."*

13

• the Infringing Work describes "***begging*** my kids
to eat vegetables," as well as "*coerc[ing] **them to**
**eat** food they found disgusting."

(d) Both the Book and the Infringing Work explain that the author
is not a professional chef, just a mother who desires to have
peace at the dinner table and to feed her children nutritious
food. Both works discuss how the author overcame the guilt of
tricking her kids into eating healthy food.

• The Book states that "this method has brought
***peace to our family table,***" that "[i]n many
families, the dinner table becomes a battleground
and meal time is a ***power struggle,***" and that "I
couldn't use logic, but I couldn't afford to ***give up***
either."

• The Infringing Work states: "I just wanted a little
***peace around the dinner table,***" and continues, "I
want my kids to associate food and mealtimes with
happiness and conversations, not ***power struggles***
and strife." The Infringing Work acknowledges,
"[W]e just want to ***give up.***"

14

(e) Both the Book and the Infringing Work characterize the author's solution as an "*epiphany*" and state the benefits that accompany nutritional camouflage.

• The Book explains: "There are many *foods that kids won't go near* in their virgin condition, but after ten seconds in the blender, those same broccoli stalks they made a face at yesterday are now eaten without a fight."

• The Infringing Work explains: "I have become an expert at hiding vegetables purees and other healthful additional - *foods my kids wouldn't touch* otherwise - in all of their favorite dishes."

• As an example, both the Book and the Infringing Work advocate allowing children to put *sprinkles* on their food to enhance its appeal.

(f) Both the Book and the Infringing Work discuss how the author succeeded in hiding "good-for-you" foods in the dishes that kids naturally love, and how the author's family is now happier.

• The Book states: "It got our *whole family* eating together in peace."

• The Infringing states: "[T]he **whole family** is
happier and we can finally enjoy mealtimes again."

(g) Both the Book and the Infringing Work address arguments
against "sneaking" vegetables into children's dishes and then
systematically refute each one.

• The Book likens the practice to a form of *"loving
deceit."*

• The Infringing Work likens the practice to a form
of *"[l]oving [d]eception."*

(h) Both the Book and the Infringing Work state that forbidden
foods are more alluring to children and suggest that, for that
reason, foods such as candy should not be forbidden.

(i) Both the Book and the Infringing Work provide explanatory
passages at the beginning of the work regarding nutrition and
directions for the creation and use of the purees, with the latter
portion of the work discussing the use of the purees.

(j) The Book, on its cover, spine and first page, uses the caricature
of a chef, winking, holding a finger to her lips as if saying
"shhh" and hiding carrots behind her back, as well as
repeatedly using a drawing of a carrot wearing sunglasses

16

making the same "shhh" gesture. In a substantially similar way, the cover of the Infringing Work uses a caricature of Jessica Seinfeld as a chef, winking, with carrots on a cutting board behind her back, as well as repeatedly using, including on its spine, first page and insert, a drawing of Jessica Seinfeld holding a finger to her lips as if saying "shhh."

(k) The subtitle of the Book, "Simple Strategies for Hiding Healthy Foods in Kids' Favorite Meals," is substantially similar to the subtitle of the Infringing Work, "Simple Secrets to Get your Kids Eating Good Food."

(l) In both the Book and the Infringing Work, each recipe is printed on a page with a border around the text. In the Book, the border is a straight-line box; in the Infringing Work, the border is a wavy-line box.

(m)    Both the Book and the Infringing Work use line-drawn, cartoon graphics, except when showing dishes made according to recipes, they use full-color photographs.

(n)   Both the Book and the Infringing Work include icons with each recipe. The Book uses icons that represent the particular

17

sneaky method used; the Infringing Work uses icons that represent the particular fruits and vegetables used.

(o) Both the Book and the Infringing Work, in setting forth the use of purees, use a different font color for purees from the color used for the other ingredients.

(p) Both the Book and the Infringing Work suggest the same approach to cooking healthy food for children -- get the right tools (e.g., a small food processor), get the *"staple"* foods, make the vegetable and fruit purees once a week and refrigerate or freeze them, and then, at meal time, make the recipes using the purees to inject healthy foods into the dishes.

(q) Both the Book and the Infringing Work next set forth the staples of a well-stocked kitchen, including a list of which foods children will most often and least often eat without a fight.

(r) Both the Book and the Infringing Work recommend *steaming* the vegetables, pureeing them in a *food processor, packaging* them in *1/4 cup baggies*, and then *freezing* them for later use.

• The Book states: "[Y]ou will find the Make-Ahead . . . are your best friends . . . once you have

these purees and blends in your refrigerator or freezer, *simply grab a spoonful and mix it into the recipes as called for*." The Book claims that with respect to ". . . the scratch recipes, you'll spend *less than thirty minutes* for each one."

• The Infringing Work states: "You will quickly learn to prepare, cook, puree, and portion the purees. Then the *purees will be available to use when they're called for*, just like any other ingredient in my recipes." The Infringing Work claims that ". . . the recipes . . . are doable in *thirty minutes or less* . . ."

(s) Both the Book and the Infringing Work talk about "*sneak*[ing]" the purees into typical kid food to remove "stress." The Book calls this being "*sneaky*," and the Infringing Work refers to it as the "*sneak it in*" technique.

• The Book states: "*[P]arental control* does not have to come in the form of a *constant battle*."

• The Infringing Work states: "It empowers you to exert some legitimate *control* over what your children eat, without inviting the *usual fights*."

(t) Both the Book and the Infringing Work also provide suggestions for and explanations of how purees can be incorporated into pre-packaged, store-bought foods.

(u) Both the Book and the Infringing Work implore the reader to enthusiastically test the purees and recipes.

• The Book states, "[L]et's put these clever methods into *action*"

• The Infringing Work states, "[Y]ou're *ready for action*."

(v) Both the Book and the Infringing Work suggest adding the same specific fruit or vegetable puree to the same dishes, as set forth below:

| Children's Dish | Hidden Puree Used in the Book | Hidden Puree Used in the Infringing Work |
|---|---|---|
| Chocolate Pudding | Avocado | Avocado |
| Chocolate Chip Cookies | White Bean | White Bean |
| Brownies | Spinach | Spinach |
| Grilled Cheese | Sweet Potato | Sweet Potato |

| French Toast | Sweet Potato/Carrot | Sweet Potato/Carrot |
| Mac 'n Cheese | Cauliflower | Cauliflower |
| Meat Sauce/Bolognese | Sweet Potato | Sweet Potato |
| Twice-Baked Potatoes | Cauliflower | Cauliflower |
| Chicken Tenders | Sweet Potato | Sweet Potato |
| Peanut Butter and Jelly Muffins | Carrot | Carrot |
| Green Eggs | Spinach | Spinach |

### To Deflect Attention From His Wife's Infringement, Jerry Seinfeld Defames Lapine on National Television

34.    Upon release of the Infringing Work in early October 2007, Jessica Seinfeld launched a national promotional campaign, appearing on such popular television programs as The Oprah Winfrey Show and Live with Regis and Kelly. The Infringing Work received favorable reviews and became a best seller.

35.    In light of the substantial similarity between the Book and the Infringing Work, within weeks of publication of the Infringing Work, numerous statements were made on the Internet and in print and television media that Jessica Seinfeld had plagiarized the Book.

21

36.    On October 29, 2007, to deflect attention from the mounting public accusations of plagiarism against his wife, defendant Jerry Seinfeld used an appearance on the immensely popular CBS television program, Late Show With David Letterman, to launch a malicious, premeditated and knowingly false and defamatory attack, uttering egregiously false and reprehensible statements about Lapine.

37.    In that appearance, Jerry Seinfeld stated that Lapine was a mentally unbalanced celebrity stalker who falsely concocted accusations of plagiarism to thrust herself into the limelight and harass the Seinfelds. Jerry Seinfeld stated that Lapine was an "angry" and "hysterical" "wacko" who had been "waiting in the woodwork" to "spring out" and "go wacko" on the Seinfelds. Seinfeld stated that Lapine was similar to the "wackos" who had victimized Letterman in two widely publicized and harrowing episodes several years ago. To bring home the point that Lapine was a mentally unhinged stalker of the Seinfelds, Jerry Seinfeld further suggested that Lapine could be an "assassin."

38.    Seinfeld's slanderous attack on Lapine included, among others, the following statements uttered before a national television audience.

**David Letterman**: And speaking of mother, the mother of your child, uh, children, your wife, big cookbook, congratulations on the cookbook.

22

**Jerry Seinfeld**: Thank you very much, yes, my wife has a very big cookbook, but -

**Letterman**: What's the name of the cookbook?

**Seinfeld**: -- the cookbook is called, uh, *Deceptively Delicious*, but there is cookbook controversy, now you know...

**Letterman**: What do you mean?

**Seinfeld**: -- I don't like to come on the show without some controversy brewing, where I can inject myself --

\* \* \* \* \*

**Seinfeld**: . . . . So, um, now my wife likes to cook, so she comes up with this thing where she's pureeing vegetables and she's putting them in the kid's food, and the kids, so they get like better nutrition, and she's doing this and then her friends start doing it, and then she has two sisters and they have kids, and they start doing it.  So they're passing all these recipes around. So somebody says to her, you should put these recipes into a cookbook, make a cookbook.

**Letterman**: Right. Excellent idea.

**Seinfeld**: Because it's healthy and we, the fat kids and the obesity, and it's positive, positive thing.

**Letterman**: It's a serious problem. Sure.

23

**Seinfeld**: So she makes the cookbook, everybody is happy, it does well, seemingly an innocent sequence of events.

**Letterman**: Mmm.

**Seinfeld**: *Now you know, having a career in show business, one of the fun facts of celebrity life is, wackos will wait in the woodwork to pop out at certain moments of your life to inject a little adrenalin into your life experience.*

**Letterman**: Yes, just a little tap to get your attention.

**Seinfeld**: *Yes, I have wackos, you have had wackos. I believe your wackos are very well documented.*

**Letterman**: Heh, yeah. Uh, yes. That's one good thing. You got all the paperwork.

**Seinfeld**: *Now, if you're any good as a woodwork wacko, you are patient. You wait. You pick your moment and then you spring out and go wacko. So, there's another woman who had another cookbook. And it was a similar kind of thing with the food, and the vegetables in the food, and uh, my wife never saw the book, read the book, used the book.*

**Letterman**: Knew nothing about it.

**Seinfeld**: Didn't know anything about it. *But the books came out at the same time.*

24

**Letterman:** Mm hmm.

**Seinfeld:** *So this woman says, "I sense this could be my wacko moment."*

**Letterman:** Ahhh. Oh.

**Seinfeld:** *So she comes out and she says, and she accuses my wife, she says, you stole my mushed-up carrots. You can't put mushed-up carrots in a casserole, I put mushed-up carrots in the casserole. It's vegetable plagiarism.*

**Letterman:** It's ridiculous.

***** *

**Letterman:** . . . . And what does this woman think, that she's the first one to prepare and eat food?

**Seinfeld:** *I, I guess so. And I'm more upset, we're sorry that she is, you know, angry and hysterical, and because she's a three-name woman, which is what concerns me. She has three names.*

**Letterman:** Oh, mmm.

**Seinfeld:** *And you know, if you read history, many of the three-name people do become assassins.*

**Letterman:** Yeah, yeah. Now, um --

**Seinfeld:** *Mark David Chapman. And you know, James Earl Ray. So, that's my concern.*

25

39. Jerry Seinfeld's statements on the Letterman program stated, expressly and by inference, implication and insinuation, that Lapine is a mentally unhinged celebrity stalker who poses a potentially violent threat to the Seinfelds, and that she falsely concocted accusations of plagiarism against Jessica Seinfeld. A reasonable person watching Jerry Seinfeld on the Letterman program necessarily would conclude that Jerry Seinfeld had imputed to Lapine mental illness and potentially violent or, at a minimum, hostile, tendencies, proclivities and activities.

40. For example, when Jerry Seinfeld told Letterman, *"I have wackos, you have had wackos. I believe your wackos are very well documented,"* Seinfeld was referring to two stalking episodes involving Letterman that received extensive national press coverage. One such episode, which occurred in the late 1990s, involved Margaret Mary Ray, a woman diagnosed with schizophrenia who repeatedly broke into Letterman's home. The other widely-publicized episode involved a 2005 plot to kidnap Letterman's infant son and hold him hostage for a $5 million ransom.

41. On the same day he appeared on Late Show With David Letterman, Jerry Seinfeld also appeared on E! News, broadcast on the E! network. Seinfeld used his appearance on that program again to make outrageously false statements about Lapine's mental health, stating that she

was a "nutjob" who had seized upon the cookbook controversy to extort

money from the Seinfelds:

**Host:** Your wife has done such great philanthropy work over the years,

especially with children. There's lots of controversy now around her book.

Is she unfairly being criticized? That's right. Yeah, exactly. And what does

this woman think, that she's the first one to prepare and eat food?

**Seinfeld:** *As a celebrity, I enjoy the fact that whenever you do something;*

*some nut job comes out of the woodwork and gets hysterical. I know the*

*truth that nothing ever happened. I don't know if you know the story*

*about the guy I went to college with who claimed I stole the whole TV*

*series from him, and he sued me for 100 million dollars. So this woman is*

*another kind of nut. You know, she thinks she invented vegetables. And*

*she's accusing my wife of stealing her mashed-up carrots.*

42.    Jerry Seinfeld's statements on the E! News program stated,

expressly and by inference, implication and insinuation, that Lapine is a

mentally unhinged celebrity stalker who seized upon the cookbook

controversy to concoct false accusations of copying to extort money from

the Seinfelds. A reasonable person watching Jerry Seinfeld on E! News

necessarily would conclude that he, directly and by implication, had imputed

to Lapine mental illness and a tendency and proclivity to lie and extort.

43.    In both television appearances Jerry Seinfeld's statements were offered as facts or implied facts known to him - someone close to his wife's book controversy who has *insider* information.

44.    The statements uttered by Jerry Seinfeld about Lapine, as described above, are entirely false.  Lapine does not suffer from any mental infirmity; she is not a celebrity stalker; she is not a violent or dangerous person; she did not and does not engage in extortion; she is not a liar; she did not, until the filing of this complaint, make any specific accusations against Jessica Seinfeld (although she had more than ample grounds to do so); she did not fabricate accusations against Jessica Seinfeld to gain media attention, enrich herself or harass the Seinfelds; and she was not lying in wait for an opportunity to become embroiled in a controversy with any celebrity -- much less the Seinfelds.

45.    Lapine is not a public figure, but even if Lapine were to be considered a public figure for the purposes of her defamation cause of action, Jerry Seinfeld knew that his defamatory statements about Lapine were false, and made with malice, or reckless disregarded of the truth.

46.    Jerry Seinfeld's defamatory statements about Lapine have caused and are continuing to cause Lapine severe damage.

### First Claim for Relief

### On Behalf of Plaintiff Missy Chase Lapine

(Copyright Infringement under 17 U.S.C. §§ 101 et seq. --Against

Defendants Jessica Seinfeld, HarperCollins, and Departure)

47.    Plaintiff Missy Chase Lapine repeats and realleges the allegations

of paragraphs 1 through 46.

48.    The Book contains a substantial amount of protected material

wholly original with Lapine and copyrightable subject matter under the laws

of the United States.  The expression, presentation, arrangement, structure

and organization of the Book's content, as well as the Book's explanations,

descriptions, phrases, philosophies, recipes, "sneaky tips," methods,

solutions, premise, styling and designs were the result of Lapine's original,

creative and independent authorial judgment.  The Book's components are

expressed by Lapine in a sequence, order, arrangement, organization and

structure selected by, and original to, Lapine.

49.    Since February 2006, Lapine has been, and is, the sole proprietor

of all right, title, and interest in and to the copyright in the Book.

50.    At all times relevant hereto, all copies of the Book made by Lapine

or under her authority or license in the United States and elsewhere have

been printed in strict conformity with the Copyright Act of the United States

and all other laws governing copyright in the areas where the Book has been published.

51.    Lapine has conveyed no copyright interest in the Book or any edition thereof to HarperCollins, Jessica Seinfeld, or Departure.

52.    Defendant Jessica Seinfeld incorporated Lapine's original expression, arrangement, presentation, structure, methods, phrases, philosophies, designs, styling, descriptions, organization, structure, premise, and recipes, incorporating significant elements of the Book's copyrightable, protected, original expression into the Infringing Work.

53.    As a result of defendant Jessica Seinfeld's infringement of Lapine's copyright, the Infringing Work and the Book, are substantially similar.

54.    Defendants, with knowledge of Lapine's ownership of the copyright in the Book, willfully infringed Lapine's rights by producing, promoting, distributing and otherwise exploiting the Infringing Work.

55.    Departure claims Copyright in the Infringing Work, and HarperCollins is the publisher of the Infringing Work.  Defendants have earned revenues from producing, promoting, distributing and otherwise exploiting the Infringing Work.

56.    As a direct and proximate result of Defendants' conduct, Lapine

has been damaged in an amount to be determined at trial.

## Second Claim for Relief

### On Behalf of Missy Chase Lapine and The Sneaky Chef

(Trademark Infringement under Lanham Act §§ 32 and 43(a) --Against

Defendants Jessica Seinfeld, Departure, and HarperCollins)

57.    Plaintiffs repeat and reallege the allegations of paragraphs 1

through 56.

58.    Plaintiffs are the sole proprietors of all right, title and interest in

The Sneaky Chef word and image trademarks.

59.    Lapine first used The Sneaky Chef word and image trademarks in

commerce in connection with her business in or about February 2007.  The

image trademark contains a line drawn caricature image of a female chef

winking, holding a finger to her lips as if to say "shhh" , and hiding carrots

behind her back.

60.    Subsequently, Lapine initiated the registration process for both the

"Sneaky Chef" word trademark and the above-described image trademark.

On December 25, 2007, the United States Patent and Trademark office

issued Lapine Registration No. 3360525 related to the word trademark.

Additional registration applications: Serial No. 77315353, as related to the

word trademark, and Serial Nos. 77254965 and 77336128, as related to the image trademark, are pending.

61.     By virtue of the Book's sales and promotion, as well as the distinctive appearance and nature of The Sneaky Chef word and image trademarks, the trademarks have acquired a secondary meaning attributable to plaintiffs. Lapine's education, expertise and years of effort in improving the diets and health of American children and the culinary arts have contributed to the credibility and goodwill fostered in the trademarks.

62.     Jessica Seinfeld (who has no education, expertise or experience concerning children's nutrition or culinary arts) and the codefendants have, in bad faith, adopted a confusingly similar mark, making use, on the Infringing Work's cover, of a line-drawn caricature of a female chef preparing food, winking, while hiding carrots behind her back. An additional image appears on the spine of the Infringing Work and on Jessica Seinfeld's Web site containing a line-drawn image of a female holding a finger to her lips as if to say "shhh."

63.     The above-described elements of the Infringing Work are designed and conceived to mislead the public into associating the Infringing Work with the Book, and are likely to cause consumer confusion, initial interest confusion, mistake and deception of the public as to the identity and origin

of plaintiffs' goods, and as to any affiliation or relationship between the two

works and parties, causing irreparable harm to plaintiffs.

64.    The Infringing Work has been advertised, sold and distributed in

interstate commerce.

65.    As a direct and proximate result of Defendants' conduct, plaintiffs

have been damaged in an amount to be determined at trial

### Third Claim for Relief

### On Behalf of Missy Chase Lapine

(Unfair Competition under Lanham Act § 43(a) --Against Defendants

Jessica Seinfeld, HarperCollins, and Departure)

66.    Missy Chase Lapine repeats and realleges the allegations of

paragraphs 1 through 65.

67.    Through great personal effort, work, expense, and sacrifice, Lapine

researched, cooked, and tested techniques, recipes, and systems to help

parents feed vegetables to their children with the least resistance. Lapine's

independent effort resulted in the development of techniques, recipes, and

systems that were Lapine's property.

68.    Lapine's years of effort and her resulting property were contained

in the Book manuscript she sent to HarperCollins for review and possible

publication. Jessica Seinfeld, her employees, agents, or representatives,

33

misappropriated Lapine's property for use, in whole or in part, in the Infringing Work. Lapine's property is manifest throughout the Infringing Work.

69.    In addition, Lapine's Book contains a substantial amount of protected material wholly original with Lapine; copyrightable subject matter under the laws of the United States. The expression, presentation, arrangement, structure and organization of the Book's content, as well as the Book's explanations, descriptions, phrases, philosophies, recipes, "sneaky tips," methods, solutions, premise, styling and designs were the result of Lapine's original, creative and independent authorial judgment. The Book's components are expressed by Lapine in a sequence, order, arrangement, organization and structure selected by, and original to, Lapine.

70.    Since February 2006, Lapine has been, and is, the sole proprietor of all right, title, and interest in and to the copyright in the Book.

71.    At all times relevant hereto, all copies of the Book made by Lapine or under her authority or license in the United States and elsewhere have been printed in strict conformity with the Copyright Act of the United States and all other laws governing copyright in the areas where the Book has been published.

72.    Lapine has conveyed no copyright interest in the Book or any

edition thereof to HarperCollins, Departure, or Jessica Seinfeld.

73.    Defendants incorporated Lapine's original expression,

arrangement, presentation, structure, methods, phrases, philosophies,

designs, styling, descriptions, organization, structure, premise, and recipes,

incorporating significant elements of the Book's copyrightable, protected,

original expression into the Infringing Work.

74.    Therefore, the following representations, made by defendants

Jessica Seinfeld, HarperCollins, or Departure, including their employees,

representatives, or agents, constitute misrepresentations of fact, false

descriptions of fact, and false designations of origin:

- from page 9 of the Infringing Work, commenting on the content of the

  Infringing Work, "[Seinfeld] has *done all the work*, and now we can

  benefit from *her efforts*."  (Emphasis added.);

- from the website advertising the Infringing Work,

  http://www.deceptivelydelicious.com/site/about-the-author.php,

  "…the idea for my book was my own, and every recipe in the book

  came from my own experimentation, with my own family, in my own

  kitchen.  And it all started with my own 'eureka' moment.";  and

35

- from the copyright page, "DECEPTIVELY DELICIOUS. Copyright
  © 2007 Departure Productions, LLC."

75.    Defendants' statements and representations assign the entire credit
for the Infringing Work and Lapine's property contained therein, to
themselves, and fail to credit Lapine or her Book.

76.    The above described misrepresentations are designed, are
conceived, and are likely, to cause confusion, cause mistake, or to deceive as
to the origin of the Infringing Work and Lapine's property contained therein.

77.    As a direct and proximate result of defendants' conduct, Lapine
has been damaged in an amount to be determined at trial.

## Fourth Claim for Relief

### On Behalf of All Plaintiffs

(Trademark Infringement under N.Y. Gen. Bus. Law § 360-k --Against
Defendants Jessica Seinfeld, Departure, and HarperCollins)

78.    Plaintiffs repeat and reallege the allegations of paragraphs 1
through 77.

79.    Defendants have used and continue to use, without plaintiffs'
consent, a colorable imitation of The Sneaky Chef trademark in connection
with the sale, distribution, offering for sale, or advertising of the Infringing
Work.

80.    Defendants' improper and bad-faith use of a confusingly similar mark is likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services.

81.    Defendants intended to cause confusion or mistake or to deceive as to the source of origin of such goods or services.

82.    As a direct and proximate result of Defendants' conduct, plaintiffs have been damaged in an amount to be determined at trial.

### Fifth Claim for Relief

### On Behalf of All Plaintiffs

(Injury to Business Reputation under N.Y. Gen. Bus. Law § 360-l --Against Defendants Jessica Seinfeld, Departure, and HarperCollins)

83.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 82.

84.    Jessica Seinfeld's use of a confusingly similar trademark injures and creates a likelihood of injury to plaintiffs' business reputation because persons encountering Jessica Seinfeld and her products and services will believe that Jessica Seinfeld is affiliated with or related to or has the approval of plaintiffs.

85.    Any adverse reaction by the public to Jessica Seinfeld and the quality of her products and the nature of her business will injure the business

reputation of plaintiffs and the goodwill that they enjoy in connection with The Sneaky Chef trademark, goods and services.

86.    As a direct and proximate result of Jessica Seinfeld's conduct, plaintiffs have been damaged in an amount to be determined at trial.

### Sixth Claim for Relief

### On Behalf of Plaintiff Missy Chase Lapine

(Slander and Slander Per Se --Against Defendant Jerry Seinfeld)

87.    Plaintiff Missy Chase Lapine repeats and realleges the allegations of paragraphs 1 through 86.

88.    Jerry Seinfeld's false statements about Lapine constitute slander and/or slander per se.

89.    Jerry Seinfeld's statements were textually sufficient for a listener to identify Lapine, and only Lapine, as the target of his falsehoods.

90.    Jerry Seinfeld's false and defamatory statements were made with malice, as such statements were made by Jerry Seinfeld with knowledge of their falsity or with reckless disregard for their falsity.

91.    As a proximate result of Jerry Seinfeld's false and defamatory statements, Lapine has suffered injury, including pecuniary loss, in an amount to be determined at trial.

92.    Because Jerry Seinfeld's made his false and defamatory statements
described above knowingly, willfully, maliciously and in conscious
disregard of Lapine's rights, Lapine is entitled to an award of punitive
damages in an amount to be determined at trial.

### Seventh Claim for Relief

### On Behalf of Plaintiff Missy Chase Lapine

(Breach of Implied Contract against HarperCollins)

93.    Plaintiff Missy Chase Lapine repeats and realleges the allegations
of paragraphs 1 through 92.

94.    In February and May of 2006, Lapine sent her Book proposal
manuscript to HarperCollins for review.

95.    Because HarperCollins is a publisher, and Lapine an author,
manuscript submission for review and potential publishing created an
implied contract, wherein HarperCollins agreed to accept, and did accept,
the manuscript for limited purposes, consistent with their respective position.
Harper Collins retained possession of the material submitted by Lapine.

96.    Given the relative position of the parties (publisher and author) and
the circumstances (author submitting manuscript for consideration of
publication), Lapine's submission of the Book manuscript, with its original
and novel ideas, philosophy, advice, methods, systems, and recipes, was

39

performed with the understanding and expectation, fully and clearly understood by HarperCollins, that Lapine would be reasonably compensated if HarperCollins made use of the Book manuscript, or Lapine's ideas, recipes, or other matter it contained. It was additionally understood and expected by the parties, that with HarperCollins' acceptance of Lapine's Book manuscript, HarperCollins would treat the Book manuscript and its contents in a manner not inconsistent with their understanding and expectation.

97.     HarperCollins, their employees, agents, or representatives, breached the implied contract by using the original and novel ideas conveyed in the Book manuscript, without compensating Lapine, by including those ideas in the Infringing Work.

98.     HarperCollins, their employees, agents, or representatives, breached the implied contract when they used or allowed the Book manuscript or its contents to serve the writers of the Infringing Work, without compensating Lapine.

99.     HarperCollins, their employees, agents, or representatives, breached the implied contract, and their obligation of good faith and fair dealing that is part of the contract when HarperCollins used the Book manuscript or its contents in a manner or for a purpose inconsistent with the

understanding and expectation of the parties, and, without compensating

Lapine.

100.   Lapine performed all conditions, covenants and promises in

accordance with the terms of the implied contract.

101.   As a direct and proximate result of HarperCollins' conduct, Lapine

has been damaged in an amount to be determined at trial.

### Eighth Claim for Relief

### On Behalf of Plaintiff Missy Chase Lapine

(Misappropriation and Unfair Competition against HarperCollins)

102.   Plaintiff Missy Chase Lapine repeats and realleges the allegations

of paragraphs 1 through 101.

103.   Through great personal effort, work, expense, and sacrifice, Lapine

researched, cooked, and tested techniques, recipes, and systems to help

parents feed vegetables to their children with the least resistance.  Lapine's

independent effort resulted in the development of techniques, recipes, and

systems that were Lapine's property.

104.   Lapine's years of effort and the resulting property were contained

in the Book manuscript she sent to HarperCollins.  In February and May of

2006, Lapine sent her Book manuscript to HarperCollins, for the limited

purpose of review for possible publication.

105.   HarperCollins, its employees, agents, or representatives, misappropriated Lapine's property through its use by codefendants, their employees, agents, or representatives in codefendants' Infringing Work.

106.   The misappropriation occurred within the scope, and through the regular and established channels authors use to secure publication. HarperCollins' misappropriation was done for the purpose of selling Lapine's property themselves, via the Infringing Work, in direct competition with Lapine.

107.   The misappropriation occurred before Lapine  was able to reap the economic value of her property in the market place.

108.   As a direct and proximate result of HarperCollins' conduct, Lapine has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that judgment be entered:

(1) On the First Claim for Relief, against defendants Jessica Seinfeld, Departure, and HarperCollins, and in favor of Plaintiff Missy Chase Lapine:

(a) awarding, pursuant to 17 U.S.C. § 504(b), actual damages and disgorgement of all profits attributable to the Infringing Work, including, but not limited to, all profits from (i) distributing the Infringing Work for

domestic and international release; and (ii) otherwise exploiting the

Infringing Work through licensing, merchandising or other means; and

(b) awarding, pursuant to 17 U.S.C. § 504(c), statutory damages;

(2) On the Second Claim for Relief, against defendants Jessica Seinfeld,

Departure, and HarperCollins, and in favor of plaintiff Missy Chase Lapine

and The Sneaky Chef, Inc., awarding, pursuant to § 35 of the Lanham Act,

15 U.S.C §§ 1117(a) damages, as well as disgorgement of all profits

attributable to the Infringing Work, including, but not limited to, all profits

from (i) distributing the Infringing Work for domestic and international

release; and (ii) otherwise exploiting the Infringing Work through licensing,

merchandising or other means;

(3) On the Third Claim for Relief, against defendants Jessica Seinfeld,

Departure, and HarperCollins, and in favor of plaintiff Missy Chase Lapine

and The Sneaky Chef, Inc., awarding, pursuant to § 35 of the Lanham Act,

15 U.S.C §§ 1117(a) damages, as well as disgorgement of all profits

attributable to the Infringing Work, including, but not limited to, all profits

from (i) distributing the Infringing Work for domestic and international

release; and (ii) otherwise exploiting the Infringing Work through licensing,

merchandising or other means;

(4) On the Fourth Claim for Relief, against defendants Jessica Seinfeld,

Departure, and HarperCollins, and in favor of plaintiffs Missy Chase Lapine

and The Sneaky Chef, Inc., awarding, pursuant to N.Y Gen. Bus. Law §

360-m, actual damages and disgorgement of all profits attributable to the

Infringing Work, including, but not limited to, all profits from (i)

distributing the Infringing Work for domestic and international release; and

(ii) otherwise exploiting the Infringing Work through licensing,

merchandising or other means; as well as multiple damages in the amount of

three times the damages suffered by plaintiffs, pursuant to N.Y Gen. Bus.

Law § 360-m;


(5) On the Fifth Claim for Relief, against defendants Jessica Seinfeld,

Departure, and HarperCollins, and in favor of plaintiffs Missy Chase Lapine

and The Sneaky Chef, Inc., awarding, pursuant to N.Y Gen. Bus. Law §

360-m, actual damages and disgorgement of all profits attributable to the

Infringing Work, including, but not limited to, all profits from (i)

distributing the Infringing Work for domestic and international release; and

(ii) otherwise exploiting the Infringing Work through licensing, merchandising or other means; as well as multiple damages in the amount of three times the damages suffered by plaintiffs, pursuant to N.Y Gen. Bus. Law § 360-m;

(6) On the Sixth Claim for Relief, against defendant Jerry Seinfeld and in favor of plaintiff Missy Chase Lapine, awarding compensatory and punitive damages in amounts to be determined at trial;

(7) On the Seventh Claim for Relief, against HarperCollins, and in favor of plaintiff Missy Chase Lapine, awarding contract damages, in an amount proven at trial.

(8) On the Eighth Claim for Relief against defendant HarperCollins, and in favor of Plaintiff Missy Chase Lapine, awarding compensatory and punitive damages according to proof at trial.

(9) Awarding plaintiffs their costs, expenses, interest and reasonable attorneys' fees;

(10) Granting such other and further relief as this Court deems just and

proper.


Dated: April 17, 2008


GIRARDI | KEESE

By: *[signature]*

Howard B. Miller
Amanda L. McClintock
Joseph C. Gjonola
1126 Wilshire Boulevard
Los Angeles, CA 90017
Tel. (213) 977-0211
Fax (213) 481-1554
hmiller@girardikeese.com
amcclintock@girardikeese.com
jgjonola@girardikeese.com

SEEGER WEISS LLP
Christopher A. Seeger (CS-4880)
David R. Buchanan (DB- 6368)
One William Street, Suite 10
New York, NY 10004
Tel. (212) 584-0757
Fax. (212) 584-0799
cseeger@seegerweiss.com
dbuchana@seegerweiss.com

# EXHIBIT D

**(DVD of Jerry Seinfeld's
10/29/2007 *Late Show* Appearance)**

# TO BE SUBMITTED

# IN HARD COPY

# Exhibit E

BROADCAST TRANSCRIPT

Video Monitoring Services of America, Inc.

(FAX)

Date     October 29, 2007
Time     11:35 PM - 12:35 AM
Station  CBS
Location Network
Program  The Late Show w/David Letterm.

DAVID LETTERMAN, host:

OK, what a--what a program for you tonight, ladies and
gentlemen.  Former manager of the New York Yankees:  Joe
Torre is joining us this evening;  four world
championships.

Also, Jerry Seinfeld is on the program.  That's the show.

And--and then look at this.  You have season nine of the
great Jerry Seinfeld program right there.  It is now
available in DVD.  And also, he has a brand new motion
picture entitled "Bee Movie," and it opens on Friday.

Jerry's been a very busy fellow:  Jerry Seinfeld, yes.

And I--I--I think--I'm not sure of this.  But I think
there's a chance I'm in this movie.  I think I might be in
the movie.

PAUL SHAFFER, Musical Director:

You're in the "Bee Movie."

LETTERMAN:  In the "Bee Movie."  I'm not certain because
had the vague memory years and years ago of participating
in something that was supposed to be in the movie, but I
don't know.

SHAFFER:  I see

LETTERMAN:  So we'll find out if I'm in the movie.

SHAFFER:  You might be.  Remember, he had that other
documentary movie.  Maybe you were in that one.

LETTERMAN:  Maybe I was in that one as well.

SHAFFER:  Yeah.

LETTERMAN:  But is there ever a better reason to buy a

ticket than to find out if I'm in the movie?

SHAFFER:  I'm in.

LETTERMAN:  No, that's it.  That's exactly--

SHAFFER:  Opening day.

* * *

(Unrelated Material)

* * *

LETTERMAN:  All right, our first guest wrote and produced and stars in a new animated film entitled, "Bee Movie."

I think--I think I'm in this movie.  I have a pretty strong hunch that I'll be in this film.

The "Bee Movie" opens on Friday.  Here's the very funny and talented Jerry Seinfeld.

Jerry, come on out.  Good to see you again, Jerry.

Mr. JERRY SEINFELD (Comedian, Actor, Producer):  Good to be back on base.

LETTERMAN:  Yeah, it's been-been about a year since you were here.  And--

Mr. SEINFELD:  Yes.

LETTERMAN:  Now, am I in the movie or am I not in the movie?

Mr. SEINFELD:  Well, let me ask you;  do you want to be in the movie?

LETTERMAN:  I did.  I did kind of want to be in the movie, yeah.

Mr. SEINFELD:  Oh, I didn't know that.

LETTERMAN:  I see.

Mr. SEINFELD:  I thought you didn't want to be in the movie.

LETTERMAN:  No, I was looking forward to it.  What's--

Mr. SEINFELD:  You were in the movie.

LETTERMAN:  I was in the movie.

Mr. SEINFELD:  Yeah.

LETTERMAN: That's great.

Mr. SEINFELD: But now you're not.

LETTERMAN: Oh.

Mr. SEINFELD: Because I guess--

LETTERMAN: I was no good?

Mr. SEINFELD: Well, I got the wrong impression. We thought: 'Dave doesn't want to be in the movie. Let's'--

LETTERMAN: Who wouldn't want to be in the movie?

Mr. SEINFELD: I thought you didn't. Well, we needed you to come back and--and do some more.

LETTERMAN: Right.

Mr. SEINFELD: And--and--and then you bumped your lip--and

LETTERMAN: Oh yeah. See, yes--see I didn't want to do that.

Mr. SEINFELD: Yeah, right.

LETTERMAN: How are things? What's new?

Mr. SEINFELD: Things are good. What's new? You mean: do I have a new cell phone? Is that what you're getting at?

LETTERMAN: Do you have one?

Mr. SEINFELD: No, I don't. I was just thinking as I was coming out: I can't picture you on a cell phone. Do you even have a cell phone?

LETTERMAN: Yes, I own a cell phone. Yeah.

Mr. SEINFELD: You do?

LETTERMAN: Mm-hmm.

Mr. SEINFELD: Do you have any of the new ones? Do you use the--the iPhone or the--

LETTERMAN: It's the same one I got in the '50s.

Mr. SEINFELD: I don't like trying to keep up with the phone technology.

LETTERMAN: It's crazy, isn't it?

Mr. SEINFELD:  I don't like--you know, there seems to be, like, a paranoia and a hostility...

LETTERMAN:  Right.

Mr. SEINFELD:  ...around a lot of these phone features. Someone was trying to show me how to lock the phone.

LETTERMAN:  Lock the phone.

Mr. SEINFELD:  They were showing me the key.

LETTERMAN:  Yeah.

Mr. SEINFELD:  They said, 'When you hit that key you lock that phone.'

LETTERMAN:  Wow.

Mr. SEINFELD:  And I said;  'Who's trying to get into my phone?  Why do I even have to lock it?'

LETTERMAN:  Yeah.

Mr. SEINFELD:  But I--I--I just don't--it just bothers me that so much technology is supposed to make us seem smarter and it does the opposite thing.  People on phone machines still tell you to wait for the beep.

LETTERMAN:  Right.

Mr. SEINFELD:  And it's--you know, it's the 21st century here.  I think we're all up to speed.

LETTERMAN:  Yeah, kind of understand.

Mr. SEINFELD:  Yeah.

LETTERMAN:  Yeah, sure.

Mr. SEINFELD:  You know, tribesmen in Africa, you know, on their machines, it even says:  '(Seinfeld mumbles as if speaking an African dialect) beep.'

LETTERMAN:  I see.

Mr. SEINFELD:  Even they know.

LETTERMAN:  Yeah, they know.

Mr. SEINFELD:  Yeah.

LETTERMAN:  Of course they do.  Can I--can I hear that first part again, of the message?  I just want to hear that first part again, if I can.

Mr. SEINFELD: (Seinfeld mumbles as if speaking an African dialect)

LETTERMAN: OK, that's fine.

Mr. SEINFELD: They--they know about the beep.

LETTERMAN: Let me--let me ask you--

Mr. SEINFELD: The other--wait, there's one other thing before you...

LETTERMAN: OK.

Mr. SEINFELD: ...ask me--

LETTERMAN: I'll just step outside.

Mr. SEINFELD: No, go ahead. You go.

LETTERMAN: No, you go...

Mr. SEINFELD: No, you go.

LETTERMAN: ...ahead.

Mr. SEINFELD: I feel uncomfortable now.

LETTERMAN: I'll tell you why I'm always eager to have you on the show, is because I feel like you're a guy who understands what it is to be a parent. And how is that going? You got three kids and your youngest is--is two...

Mr. SEINFELD: Two.

LETTERMAN: ...and a half. Two years old.

Mr. SEINFELD: Yeah.

LETTERMAN: Yeah.

Mr. SEINFELD: I--I really settled in. I've been a parent now for almost seven years, and I've really kind of gotten into that father thing. There are certain father things, like fathers can dress really bad around the house.

LETTERMAN: Right.

Mr. SEINFELD: There was a tradition. My father did it. All fathers really essentially dress in the clothing style of the last good year of their lives. That--that's what they do.

LETTERMAN: Yeah.

Mr. SEINFELD: You know?

LETTERMAN:  That seems about right.

Mr. SEINFELD:  If you think about it...

LETTERMAN:  Yeah.

Mr. SEINFELD:  ...they kind of--they just kind of freeze that moment in fashion history...

LETTERMAN:  Yeah.

Mr. SEINFELD:  ...and ride it right out.

LETTERMAN:  Yeah.

Mr. SEINFELD:  They ride it.

LETTERMAN:  Yeah.

Mr. SEINFELD:  And it doesn't matter because it doesn't matter what dad looks like.

LETTERMAN:  Yeah.

Mr. SEINFELD:  You know, dad around the house is kind of like a day-old helium balloon, just floating.  It's not shining anymore.  It's like half--it's just barely holding the string up.

LETTERMAN:  That's me.  That's exactly me.

Mr. SEINFELD:  Should we play with it?  Should we pop it?  You know...

LETTERMAN:  Yeah.

Mr. SEINFELD:  ...which leads to the dad announcements. Do you make the announcements, daddy's home?  You always make these huge announcements...

LETTERMAN:  Yeah, yeah.

Mr. SEINFELD:  ...you know, hoping something will happen, someone will realize.  But...

LETTERMAN:  Nothing happens.

Mr. SEINFELD:  ...you're just not important.

LETTERMAN:  Help me out with this:  my son is at the age now where I know that he can tell the difference between, 'Daddy is good,' or 'Daddy is just a dork.'  And--and he will now remember this.  And--and I live in constant fear that I am creating and reinforcing memories for him that 'Daddy is just a dork.'

Mr. SEINFELD: Well, I think he's trying to figure out what you do.

LETTERMAN: Yeah.

Mr. SEINFELD: When he--around the house he's watching you and he's going, 'Why is this guy here?'

LETTERMAN: Yeah.

Mr. SEINFELD: That's what--

LETTERMAN: Yeah.

Mr. SEINFELD: That's what he's thinking...

LETTERMAN: So it's his mother.

Mr. SEINFELD: ...because you don't do anything.

LETTERMAN: Thank you very much.

Mr. SEINFELD: Yes.

LETTERMAN: It seems to be--to be the number one question.

And--and speaking of mother, the mother of your child--children, your wife, the big cookbook: congratulations...

Mr. SEINFELD: Thank you...

LETTERMAN: ...on the cookbook.

Mr. SEINFELD: ...very much. My wife has a cookbook, but--

LETTERMAN: What's the name of the cookbook?

Mr. SEINFELD: The cookbook is called "Deceptively Delicious," but there is a cookbook controversy. Now you know...

LETTERMAN: What do you mean?

Mr. SEINFELD: ...I don't like to come on the show without some controversy brewing where I can inject myself.

LETTERMAN: Yeah, you had a good one last time.

Mr. SEINFELD: I did. I had a good one last time. This one is not as good, but it's still pretty good.

LETTERMAN: OK.

Mr. SEINFELD: So my wife--now, my wife--you know my wife.

She's very do-gooder, socially-conscious, very honest-type person. Her whole family is like this. They do social work and they--they get involved with non-profit organizations.

My--my family is not like that. You know, I hear the term "non-profit," I think that doesn't sound like a very good business.

LETTERMAN: No, you're right. There's really something wrong.

Mr. SEINFELD: 'So you made nothing again this year?' I mean--but this is what they do.

LETTERMAN: Yeah.

Mr. SEINFELD: So--now my wife likes to cook, so she comes up with this thing where she's pureeing vegetables and she's putting them in the kids' food. And the kid's--so they get, like, better nutrition.

And she's doing this, and then her friends start doing it. And then she has two sisters and they have kids, and they start doing it. So they're passing all these recipes around. So somebody says to my wife, 'You should put these recipes into a cookbook.'

LETTERMAN: Right.

Mr. SEINFELD: 'Make a cookbook...'

LETTERMAN: Excellent idea.

Mr. SEINFELD: '...because it's healthy and we get the fat kids and the obesity and...'

LETTERMAN: Yeah, it's a serious problem.

Mr. SEINFELD: '...it's a positive--a positive thing.'

LETTERMAN: Yeah, sure.

Mr. SEINFELD: So she makes the cookbook. Everybody is happy. It does well: seemingly an innocent sequence of events.

Now you know, having a career in show business, one of the fun facts of celebrity life is wackos will wait in the woodwork to pop out at certain moments of your life to inject a little adrenaline into your life experience.

LETTERMAN: Just a little tap, just to get your attention.

Mr. SEINFELD: Yes.

LETTERMAN: Yeah.

Mr. SEINFELD: I have wackos. You have had wackos.

LETTERMAN: Yeah.

Mr. SEINFELD: I believe your wackos are very well documented.

LETTERMAN: Yeah. Oh yes, that's--that's one good thing; we got all the paperwork.

Mr. SEINFELD: Now if you're any good as a woodwork wacko, you are patient. You wait. You pick your moment and then you spring out and go wacko. So there's another woman who had another cookbook...

LETTERMAN: Oh.

Mr. SEINFELD: ...and it was a similar kind of thing with the food and the vegetables in the food. And my wife never saw the book, read the book; used the book. But the books--

LETTERMAN: She knew nothing about it.

Mr. SEINFELD: Didn't know anything about it. But the books came out at the same time. So this woman says, 'I sense this could be my wacko moment.'

LETTERMAN: Ah, oh.

Mr. SEINFELD: So she comes out and she says--and she accuses my wife. She says 'You stole my mushed-up carrots. You can't put mushed-up carrots in a casserole. I put mushed-up carrots in the casserole.'

LETTERMAN: That's ridiculous.

Mr. SEINFELD: 'It's vegetable plagiarism.'

LETTERMAN: That's ridiculous.

Mr. SEINFELD: I mean, this is what--I'm telling you, this is what happened.

LETTERMAN: First of all, with all deference and respect to your wife, people have been mashing up vegetables since the beginning of time.

Mr. SEINFELD: Apparently not, Mr. Letterman. So my wife, the do-gooder, who gets mad at me--

LETTERMAN: Gets mad at you for this.

Mr. SEINFELD: She gets mad at me--no, if I take two

newspapers...

LETTERMAN:  I see.

Mr. SEINFELD:  ...out of the USA Today box because I don't think they can possibly sell all those papers, she is now accused of a Watergate-style break in...

LETTERMAN:  Oh, god.

Mr. SEINFELD:  ...at Harper Collins because how else could she have known chickpeas and cauliflower?  Clearly there is some foul play.

LETTERMAN:  Your--your wife broke into the publishers.

Mr. SEINFELD:  Yes.

LETTERMAN:  Oh, man.

Mr. SEINFELD:  Yes.

LETTERMAN:  But let's get back to you swiping newspapers. Honest to god, really...

Mr. SEINFELD:  Yeah.

LETTERMAN:  ...pay for one and grab--

Mr. SEINFELD:  Yeah, I'll take two.  I can see they're not going to sell them all.  But I--I like the term "plagiarism" for this little event because it used to be you had to really take a theme from a major novel, some sort of literary narrative.

LETTERMAN:  Word for word, more or less.

Mr. SEINFELD:  Yeah, now you're in your kitchen making brownies, you sneak a little...

LETTTERMAN:  That's right.

Mr. SEINFELD:  ...spinach in there and your name is dragged through the mud.

LETTERMAN:  There--exactly.  And what does this woman think;  that she's the first one to prepare and eat food?

Mr. SEINFELD:  I--I guess so.  I--and I'm more upset --we're sorry that she is, you know, angry and hysterical, and--because she's a three-named woman, which is what concerns me.  She has three names.  And you know if you read history, many of the three-named people do become assassins.

LETTERMAN:  Yeah.  Now--

Mr. SEINFELD: Mark David Chapman and, you know, James Earl Ray. So that's my concern.

LETTERMAN: Now are you--are you worried now that--that discussing it on the television program here...

Mr. SEINFELD: Yes.

LETTERMAN: ...will actually incite or exacerbate the circumstance?

Mr. SEINFELD: Well that gets me another shot on your show.

LETTERMAN: Oh, that's right.

Mr. SEINFELD: Yeah.

LETTERMAN: Everybody can come back.

Mr. SEINFELD: Right.

LETTERMAN: We'll have a hookup.

Mr. SEINFELD: To the west coast.

LETTERMAN: To the west coast, of course. Yeah, that'll be a big night for everyone. Now Jerry, congratulations on--this is a very impressive thing.

Mr. SEINFELD: Enough, Dave.

LETTERMAN: Look...

Mr. SEINFELD: Enough with the--

LETTERMAN: ...at that.

Mr. SEINFELD: That's enough.

LETTERMAN: And then you have--

Mr. SEINFELD: Come on, you're embarrassing me.

LETTERMAN: And then you have this one right here.

Mr. SEINFELD: All right...

LETTERMAN: Now...

Mr. SEINFELD: ...we all know about the show.

LETTERMAN: ...let's--let's talk about the--

Mr. SEINFELD: It's not a million dollars.

LETTERMAN: Let's talk about--let's talk about the--the "Bee Movie." Excellent idea: I mean, first of all, the title is very clever, sort of a play on words right there.

Mr. SEINFELD: Yes.

LETTERMAN: And it's about the life of bees...

Mr. SEINFELD: Yes.

LETTERMAN: ...and--by the way, your timing couldn't be better because there is a bit of a bee crisis in North America.

Mr. SEINFELD: Well, that is actually a publicity stunt that we arranged for the movie.

LETTERMAN: He's a genius. He's a genius, ladies and gentlemen.

Mr. SEINFELD: You have no idea what it costs to vacuum out all these bees...

LETTERMAN: All those bees, yeah.

Mr. SEINFELD: ...just to generate those stories.

LETTERMAN: But a lot of big people in the film: yourself, of course; Oprah Winfrey. What a wonderful woman Oprah is.

Mr. SEINFELD: I love Oprah. You know, Oprah and I are kind of friends.

LETTERMAN: She's right here with you in the magazine; you and Oprah--

Mr. SEINFELD: Oh yes, I'm in the Oprah--there was a picture of her and I. Yeah, see that? That's the kind of thing that Oprah and I do all the time. See, there we are. Now this--

LETTERMAN: What, are you teaching Oprah how to back up?

Mr. SEINFELD: Yeah. We drive around LA like that and we'll go to Pinks, and--

LETTERMAN: You and Oprah going to Pinks. But I really like Oprah. You know, I mean, she's sort of like the real deal. Like I--I'm just a--a monkey with a show. You know, I'm just a dope.

Oprah is--is transcendent. She is a cultural treasure, honestly.

Mr. SEINFELD: She is.

LETTERMAN:  Yeah.

Mr. SEINFELD:  Is there a question?

LETTERMAN:  No, I--I thought that we were kissing up to Oprah.  All right, now when we come back we will take a look at a clip from "Bee Movie," with Jerry...

Mr. SEINFELD:  Great.

LETTERMAN:  ...Seinfeld everybody.  We'll be right back.

＊ ＊ ＊

(Commercial Break)

＊ ＊ ＊

(Banter between Letterman and Seinfeld as show comes back from break)

LETTERMAN:  I spent way too much money on it.

Mr. SEINFELD:  It's worth it.

LETTERMAN:  You think so?

Mr. SEINFELD:  Oh, yeah.

(End of Banter)

LETTERMAN:  Let's take a look--now tell people about the scene we're gonna see from the "Bee Movie," Jerry.

Mr. SEINFELD:  OK, so I--

LETTERMAN:  It opens on Friday.

Mr. SEINFELD:  The movie is basically my--me if I had been born as a bee.  That's really what the movie is.

LETTERMAN:  Right.

Mr. SEINFELD:  And this scene, I've gotten outside the hive and I'm kind of seeing the human world.  And I have the essential bug/windshield experience...

LETTERMAN:  Oh my.

Mr. SEINFELD:  ...for the first time.

LETTERMAN:  OK.  All right, "Bee Movie" opens on Friday: Jerry Seinfeld.

(Video clip from "Bee Movie" shown)

LETTERMAN:  There you go, "Bee Movie."  Chris Rock, Jerry Seinfeld and Renee Zellweger also...

Mr. SEINFELD:  Renee Zellweger.

LETTERMAN:  ...in the film, and Oprah Winfrey and many, many others.  The film opens on Friday.

Good to see you again, Jerry.

Mr. SEINFELD:  Thank you, Dave.

LETTERMAN:  Thank you very much.

Jerry Seinfeld, ladies and gentlemen.  We'll be right back with Joe Torre everybody.

### #

# EXHIBIT F

## (DVD of Jerry Seinfeld's
## 10/29/2007 *E! News Live* Appearance)

# TO BE SUBMITTED

# IN HARD COPY

# Exhibit G

# CISION

**∴ transcript**



| | |
|---|---|
| **MEDIA:** | Television |
| **STATION:** | ETV |
| **MARKET:** | National Cable |
| **DATE:** | 10/29/07 |
| **TIME:** | 07:14 PM ET |
| **PROGRAM:** | E! News Live |
| **SUBJECT:** | Jerry Seinfeld |

**ESTIMATED IMPRESSIONS: 371,692**
**ESTIMATED PUBLICITY VALUE (per 30 seconds): $16,826.50**

**Giuliana Rance, Co-Anchor:**

No, this isn't a Halloween bash. That's just a gang of costumed celebs for the L.A. premier of *Bee Movie*. But sadly, no real-life stingers were invited.

*[Begin clip of interview of Jerry Seinfeld]*

**Jerry Seinfeld, Director, *Bee Movie*:**

They're a little hard to organize, ya know. They, uh, they tend to go their own way.

*[End clip]*

**Rance:**

Jerry Seinfeld worked the black and yellow carpet with his wife, Jessica. Also on hand: a very pregnant Jeri Ryan.

And speaking of moms-to-be...

*[End of segment with Jerry Seinfeld]*

*[07:31 PM]*

  

|Video available for purchase

Material provided by Cision may be used for Internal Review, Analysis and Research Only. Any editing, reproduction, publication, retransmittal, public showing, public display or placement on any website is forbidden & may violate copyright laws.

# CISION ▸▸

▸ transcript

**Sal Masekela, Co-Host:**

Jerry defends his wife in the cookbook scandal.


**Seinfeld:**

This woman is another kinda nut. You know, she thinks she invented vegetables.


*[07:56 PM]*


**Masekela:**

The man who brought you the show about nothing has much to talk about. Jerry Seinfeld's stinging new animated *Bee Movie* is buzzing into theaters, which means that we get to pick his brain. The big Ben *[unintelligible]* talks Michael Richards, the cookbook scandal, and even Tony Soprano. Don't stop believin'; it's our number one story.


*[Begin clip of Jerry Seinfeld's interview]*


**Ben Lyons, Interviewer:**

Now this is a unique animated movie because it's not everybody doing their scenes by themselves…


**Seinfeld:**

Mm-hmm.


**Lyons:**

…you got to work with all these people…


**Seinfeld:**

Yeah.





Video available for purchase

Material produced by Cision may be used for internal review, analysis and research only. Any editing, reproduction, publication, rebroadcast, public showing, public display or placement on any website is forbidden & any visible copyright laws.

 CISION

:• transcript

**Lyons:**

…how did you assemble this amazing cast? Did you have people audition? Or do you just call your friends and say, "Hey, come be a mosquito, or come be in my movie"?

**Seinfeld:**

I would just call them. You know, some 'a them I had to stalk a little bit and kind of gently creep up on them, you know, 'cause they're big, like Renee Zellweger is a very big movie star and you can't just say, "Come on over here," you know. But Chris Rock is sittin' around with nothin' to do, you know, so.

*[Begin clip of "Bee Movie"]*

**Michael Richards, Actor:**

We're going O nine hundred at J gate.

**Seinfeld:**

Wo.

**Richards:**

What d'ya think, buzzy boy? Are ya bee enough?

**Seinfeld:**

I might be. It all depends on what.

*[End clip of "Bee Movie"]*

**Lyons:**

Michael Richards lends a voice to it…

 

# CISION

‣ transcript

**Seinfeld:**

Mm-hmm, yes.

**Lyons:**

…was this, was this because you had always envisioned him to play that character? Or are you helping out your good friend in a time of need, when many people in the industry have turned their back on him?

**Seinfeld:**

Oh, I don't think that's true. Uh, I, I—he hasn't really decided what he wants to do next. I think people will, will, uh, use him as they always have. He's one 'a the greatest talents that I've met and he's a very sweet guy.

*[Begin clip of "The Soup Nazi" episode of the television show "Seinfeld"]*

**Seinfeld:**

I happen to love that soup.

**Julia Louis-Dreyfus, Actress:**

*[As Elaine Bennis]* Get out of my way, Jerry.

**Seinfeld:**

Elaine, let the man make his soup.

*[End clip of "The Soup Nazi"]*

**Lyons:**

Now, given the current state of the television climate, if *Seinfeld* were to premier this season, do you think you would have a chance in the current marketplace?

  

|Video available for purchase

Material provided by Cision may be used for Internal Review, Analysis and Research Only. Any editing, reproduction, publication, retransmission, public showing, public display or placement on any website is forbidden & may violate copyright laws.

# CISION

:∙ transcript

**Seinfeld:**

Oh yeah, sure, sure. It was funny. You know, I, I mean, it still, it's on now. And, and there are people watching it now that never heard of it. They're watching it today for the very first time.

*[Begin clip of "The Soup Nazi" episode of the television show "Seinfeld"]*

**Larry Thomas, Actor:**

*[As "The Soup Nazi"]* No soup for you!

*[End clip of "The Soup Nazi"]*

**Lyons:**

Your wife has done such great philanthropy work over the years…

**Seinfeld:**

Mm-hmm.

**Lyons:**

…especially with children.

**Seinfeld:**

Mm-hmm.

**Lyons:**

There's lots of controversy around her book…

**Seinfeld:**

Mm-hmm.

  

Video available for purchase

Material provided by Cision may be used for internal review, analysis and research only. Any editing, reproduction, publication, rebroadcast, public showing, public display or placement on any website is forbidden & may violate copyright laws.

800.560.0111    info.us@cision.com
http://us.cision.com

# CISION

:• transcript

**Lyons:**

…is she unfairly being criticized?

**Seinfeld:**

As a celebrity, I enjoy the fact that whenever you do something, some nut job comes outta the woodwork and gets hysterical. I know the truth that nothing ever happened. I don't know if you know the story about the guy I went to college with who claimed I stole the whole TV series from him, and he sued me for a hundred million dollars. So this woman is another kinda nut…

**Lyons:**

Mm-hmm.

**Seinfeld:**

…you know, she thinks she invented vegetables *[laughter]*. And she's accusing my wife of stealing her mushed-up carrots.

*["The Sopranos" theme song plays]*

**Lyons:**

I know you're a big fan 'a *The Sopranos* and I was about…

**Seinfeld:**

Mm-hmm.

**Lyons:**

…and I was about to talk about that final episode.

**Seinfeld:**

Mm-hmm.

 Video available for purchase

Material provided by Cision may be used for internal review, analysis and Research Only. Any editing, reproduction, publication, rebroadcast, public showing, public display or placement on any website is forbidden & may violate copyright laws.

800.560.0111   info.us@cision.com
http://us.cision.com

CISION

: transcript

**Lyons:**

How hard is it and how difficult is it to go into creating a last episode of a show?

**Seinfeld:**

It's really hard. I was very impressed with how *The Sopranos* handled it. I thought the ending of that show was brilliant. To me, it was the, Tony's death scene, that's what it was. But they don't want to show you him dieing, 'cause he's your eyes into that world. So it was like everything leading up to it without showing it to ya. I thought that was really cool.

*[End clip of Jerry Seinfeld's interview]*

**Masekela:**

See *Bee Movie* on Friday.





**Video available for purchase**

Material provided by Cision may be used for internal review, analysis and Research Only. Any editing, reproduction, publication, rebroadcast, public showing, public display or placement on any website is forbidden & may violate copyright laws.

# Exhibit H

# Jerry Seinfeld

*American comedian*

*byname of*

Jerome Seinfeld

# Main

**born April 29, 1954, Brooklyn, N.Y., U.S.**

American comedian whose television show *Seinfeld* (1989–98) was a landmark of American popular culture in the late 20th century.

Seinfeld's interest in comedy was sparked at an early age through the influence of his father, a sign maker who was also a closet comedian. By age eight Seinfeld was putting himself through a rigorous comic training, watching television day and night to study the techniques of comedians. Over the years, he developed a unique style of comedy that centred on his wry observations on life's mundanities. He made his stand-up debut in 1976 and worked his way to an appearance on *The Tonight Show* in 1981, which gave Seinfeld his first national exposure. By the late 1980s he was one of the highest-profile stand-up comedians in the United States.

In 1988 Seinfeld was asked to develop a sitcom with NBC. He teamed with friend and fellow comedian Larry David to create *Seinfeld*, which was first broadcast the following year. Produced and sometimes cowritten by Seinfeld, the quirky widely watched show emphasized loosely structured stories, seemingly insignificant subject matter, and a buddy system of comedy in which the Jerry character often played a straight man to his three tightly wound screwball friends. The show reached unprecedented levels of popular and critical acclaim, and many of its catchphrases and plot elements became part of the cultural lexicon. *Seinfeld* ran for nine seasons and was still the highest-rated show in the United States when its final episode aired in 1998.

Seinfeld returned to stand-up comedy in the late 1990s, embarking on multiple national tours of comedy clubs and theatres, one of which was documented in the 2002 film *Comedian*. He also wrote *Seinlanguage* (1993), a best-selling book of

humorous observations, and the children's book *Halloween* (2003).

# Related Links

Aspects of this topic are discussed in the following places at Britannica.

**Assorted References**

. **role in "Seinfeld"** ( *in* **Seinfeld** )

# Citations

**MLA Style:**

"**Jerry Seinfeld**." Encyclopædia Britannica. 2008. Encyclopædia Britannica Online. 12

Jun. 2008 <**http://www.britannica.com/EBchecked/topic/532877/Jerry-Seinfeld**>.

**APA Style:**

**Jerry Seinfeld**. (2008). In *Encyclopædia Britannica*. Retrieved June 12, 2008, from

Encyclopædia Britannica Online:

**http://www.britannica.com/EBchecked/topic/532877/Jerry-Seinfeld**

# Exhibit I

# Seinfeld

*American television show*

## Main

U.S. television situation comedy that was among the most popular programs of the 1990s. Revered by critics, *Seinfeld* aired for nine seasons (1989–98) on **National Broadcasting Co.** (NBC), serving as the linchpin of the network's "must-see TV" Thursday night lineup.

Set in Manhattan and famously characterized in one episode as a show about nothing, it featured comedian **Jerry Seinfeld**, a master of observation, playing a fictionalized version of himself, and his three best friends: George, the fictional Jerry's boyhood buddy, a mendacious ne'er-do-well (played with hilarious persnicketiness by Jason Alexander); Elaine (Julia Louis-Dreyfus, *Saturday Night Live*, 1982–85) Jerry's former girlfriend, a relationship-obsessed quasi-careerist; and Kramer, Jerry's neighbour, a wild-haired hipster doofus with a surfeit of quirky get-rich-quick and self-improvement schemes (whom Michael Richards invested with oddball freneticism grounded in physical comedy).

In each show several seemingly disconnected plot threads stumble toward a bizarre intersection (where, as George put it, "worlds collide"). These ostensibly mundane events and petty conflicts, rooted in the rituals of urban life—finding a parking place, breaking up, pandering to parents—are endlessly analyzed by Jerry and company, generally in his apartment or at the coffee shop. *Seinfeld*, ultimately, is a **comedy of manners**, whose highlights are triggered for devotees by a shared lexicon of concepts, secondary characters, and phrases (Festivus, Newman, the Soup Nazi, "master of his domain," "Not that there's anything wrong with that").

Initially punctuated byslices of Jerry Seinfeld's standup routines, the program was cocreated by Seinfeld and head writer Larry David, on whom the character of George was based and who later created and starred in his own mostly improvised show about nothing, *Curb Your Enthusiasm*, on the Home Box Office cable network. Nominated for 68 Emmy Awards and the winner of 10, Seinfeld ranked either first or second in the Nielsen ratings from 1994–95 to 1997–98.

# Related Links

Aspects of this topic are discussed in the following places at Britannica.

**Assorted References**

. **discussed in Seinfeld biography** ( *in* **Seinfeld, Jerry** )

# Citations

**MLA Style:**

"**Seinfeld**." Encyclopædia Britannica. 2008. Encyclopædia Britannica Online. 12 Jun.

2008 <**http://www.britannica.com/EBchecked/topic/1320453/Seinfeld**>.

**APA Style:**

**Seinfeld**. (2008). In *Encyclopædia Britannica*. Retrieved June 12, 2008, from

Encyclopædia Britannica Online:

**http://www.britannica.com/EBchecked/topic/1320453/Seinfeld**

# Exhibit J

# David Letterman

*American talk-show host*

## Main

**born April 12, 1947, Indianapolis, Ind., U.S.**

 American late-night talk-show personality, producer, and comedian, best known as the host of the long-running *Late Show with David Letterman*.

After graduating from Ball State University (1969) with a degree in telecommunications, Letterman tried his hand at television as a crazy weatherman in Indianapolis. In 1975 he moved to Los Angeles, where he became a regular stand-up comic at the Comedy Store, a club for fledgling comedians. In 1978 he made the first of 22 appearances on *The Tonight Show Starring Johnny Carson*. The following year, Letterman, who had revered **Carson** since childhood, served as the show's guest host, the first of many such appearances. In 1979 the visibility Letterman gained as a guest host won him an NBC mid-morning show, *The David Letterman Show*. However, his unconventional humour—exemplified by the time he sent an audience member out to fetch him coffee—failed to engage daytime viewers. Although it received two Emmy Awards, the show was canceled after three months.

Letterman did not gain a following until he moved to late-night television with the critically acclaimed *Late Night with David Letterman*, which premiered in 1982 on NBC. The show ran immediately after Carson's *The Tonight Show*, and its ironic and offbeat humour was a hit with viewers. *Late Night* featured top-10 lists; sarcastic interplay between Letterman and his comic foil, bandleader Paul Shaffer; nonsensical skits, notably "Stupid Pet Tricks"; and roving cameras that captured ordinary people and placed them in the limelight. Letterman also became known for antagonizing some notable guests; **Cher**, for example, was moved to curse him on camera. If his behaviour turned off some guests, it excited the critics, who saw in his work an attempt to parody talk shows. Letterman insisted, however, that doing a funny talk show, not a parody, was his main intent. *Late Night with David Letterman* earned five **Emmy Awards** and 35 nominations.

When Carson announced his retirement in 1992, a very public search ensued for his replacement. Although it was believed that Carson favoured Letterman as host— Carson later regularly sent Letterman jokes for his monologues—NBC executives eventually chose Jay Leno, leaving Letterman in the time slot immediately after in an attempt to retain his high ratings. The following year, however, Letterman announced that he was leaving NBC to join competing network CBS. His new show, *The Late Show with David Letterman*, was placed opposite *The Tonight Show*. Critics immediately questioned whether Letterman and his ironic, abrasive, flippant humour would appeal to the mainsteam audience of the earlier hour. Following its August 1993 debut, however, *The Late Show with David Letterman* put that concern to rest by drawing considerably more viewers than Jay Leno's *The Tonight Show*, which, under Carson, had reigned for three decades as the leading American late-night offering.

In 1995 Letterman hosted the Academy Awards ceremony, and his performance— which included a running gag involving the first names of Oprah Winfrey and Uma Thurman—earned mixed reviews. That year also saw his *Late Show* lose its ratings edge over *The Tonight Show*, which began to consistently attract more viewers. In January 2000 Letterman underwent emergency quintuple heart bypass surgery. During his recovery, various performers, including **Bill Cosby**, served as guest hosts. His emotional return in February was among the show's highest-rated episodes. On Feb. 1, 2007, Letterman celebrated 25 years as a late-night talk-show host.

Letterman also ran his own film and television production company, Worldwide Pants. Its shows included the hit sitcom *Everybody Loves Raymond* (1996–2005).

# Related Links

Aspects of this topic are discussed in the following places at Britannica.

**Assorted References**

. **association with Romano** ( *in* **Romano, Ray** )

# Citations

**MLA Style:**

"**David Letterman**." Encyclopædia Britannica. 2008. Encyclopædia Britannica Online.

12 Jun. 2008

<http://www.britannica.com/EBchecked/topic/337486/David-Letterman>.

**APA Style:**

**David Letterman**. (2008). In *Encyclopædia Britannica*. Retrieved June 12, 2008, from

Encyclopædia Britannica Online:

**http://www.britannica.com/EBchecked/topic/337486/David-Letterman**

# Exhibit K



**THE WALL STREET JOURNAL.**
O N L I N E

**October 19, 2007**

# How Another Seinfeld Scored Her Own Big Hit

**Cookbook by Comic's Wife
Soars After Oprah Interview;
Could It Be a Million-Seller?**

**By JEFFREY A. TRACHTENBERG**
*October 19, 2007*

**DOW JONES REPRINTS**

⟨R⟩ This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

• See a sample reprint in PDF format.
• Order a reprint of this article now.

HarperCollins Publishers was sure Jessica Seinfeld's new cookbook for feeding kids healthily would be a success: It initially printed 200,000 copies and then added another 140,000 in reserve before its Oct. 5 publication date.

It wasn't nearly enough. Ever since Ms. Seinfeld, the wife of comedian Jerry Seinfeld, appeared on "The Oprah Winfrey Show" on Oct. 8, demand has far outstripped supply. Amazon.com is telling its customers they will have to wait three to six weeks to get a copy of Ms. Seinfeld's book, "Deceptively Delicious: Simple Secrets to Get Your Kids Eating Good Food."

Altogether, the publisher says it has ordered 2.3 million copies, and expects to sell at least one million by Christmas.

With the unexpected success has come some unexpected controversy. The book's popularity has prompted the author of another children's nutrition book to note similarities between the two titles, even as sales of her book are being lifted by Ms. Seinfeld's fame.



John Dolan/HarperCollins

Jessica Seinfeld and her son Shepherd

Collins, the division of HarperCollins that published Ms. Seinfeld's book, is repudiating the complaint. Its biggest fear is that it may be losing sales with Ms. Seinfeld's book unavailable at many stores.

"It's a nightmare scenario you never want to wake up from: Demand that is so intense, sales velocity so high, that you are hard-pressed to keep up," says Steve Ross, president of the Collins division. "We're going to have a lag time of two to three weeks because we don't have enough books."

Ms. Seinfeld's book is No. 1 today on the Wall Street Journal's nonfiction best-seller list. It will also be No. 1 on the hardcover advice list published in the New York Times Book Review section dated Oct. 28. Mr. Ross says he thinks that Ms. Seinfeld's book may also slip a slot or two down the Times list because of the continuing shortage.



The book has been No. 1 on Amazon.com's best-seller list, but that could also change because Amazon can't get enough books to keep pace

with orders. A spokeswoman said the online bookseller is working to get more books as soon as possible. Some Barnes & Noble stores are out of copies as well.

"Even the big chains are out of it," said Alan Zumel, a salesman at The Cook's Library, a Los Angeles bookstore specializing in cookbooks.

The premise of Ms. Seinfeld's book is that meals kids enjoy, such as lasagna, tacos and pita pizzas, can be tweaked to be more nutritious. She sneaks carrot and spinach purees into a recipe for brownies, while a recipe for chicken alphabet soup includes cauliflower puree. In her introduction, Ms. Seinfeld notes: "This book is nothing more than one mom's coping skills."

During Ms. Seinfeld's appearance on Ms. Winfrey's talk show, the host praised the book and snacked on some of Ms. Seinfeld's recipes before sharing them with her audience. "After Oprah, requests began pouring in from customers at the stores and online," says Liz Harwell, director of merchandising for Barnes & Noble Inc., the nation's largest book retailer.

Ms. Seinfeld's appearance on the show also ignited a culinary discussion on one of Ms. Winfrey's online message boards and across the Web. Some viewers have noted that adding pureed vegetables to favorite recipes isn't a new idea. One writer specifically cited, "The Sneaky Chef: Simple Strategies for Hiding Healthy Foods in Kids' Favorite Meals," by Missy Chase Lapine, published in April by the Running Press, an imprint owned by Perseus Books, LLC, an independent publisher.

The books by Ms. Seinfeld and Ms. Lapine feature similar recipes for macaroni and cheese that have vegetable purees mixed in. Both books also have recipes for chocolate pudding with pureed avocado. However, while the concepts are similar, the recipes differ in their specifics.

"Our author is concerned that there are many significant similarities between 'The Sneaky Chef,' and the Seinfeld book," says David Steinberger, chief executive of Perseus, in an email. "We agree that the books appear to be very similar in many ways. But we don't know enough about how this happened to accuse anyone of wrongdoing. We have a bestseller in 'The Sneaky Chef.' We feel it is a terrific book and right now we are focused on selling more copies of it."

In a telephone interview, Ms. Seinfeld, a mother of three, said that "I've never held that book in my hands, and I swear that on my life. When I was told there was a book of a similar type, I told myself I would never go near it. And there is no way I borrowed anything. Why would I spend my time doing that? I never claimed to have invented pureeing: Many grandmothers would say it is something they've always done. I created something that I thought would help other families."

Mr. Ross of Collins says there are similarities among all books that treat sneaking nutritious elements into children's food, of which he said there is "practically a library." Mr. Ross also says that Collins has reviewed the concerns expressed by Ms. Lapine and "found them to be without merit."

In her introduction, Ms. Seinfeld explains how she came up with her book: "Then, one evening while I was cooking dinner, pureeing butternut squash for the baby and making mac and cheese for the rest of us, I had the crazy idea of stirring a little of the puree into the macaroni. And so I did." Ms. Lapine didn't return calls seeking comment.

Ms. Lapine originally submitted her proposal to Collins, says Mr. Ross. But it was rejected on

May 23, 2006, because it was deemed too similar to another book, "Lunch Lessons: Changing the Way We Feed our Children," that Collins eventually published, Mr. Ross says.

Less than two weeks later, on June 9, an agent submitted a proposal for Ms. Seinfeld's book. A different Collins editor decided to set up a meeting because of the author's celebrity status, and the editor thought it was an interesting subject, says Mr. Ross. Ms. Seinfeld came in, and cooked food for the attendees of the meeting, and "basically wowed everybody who attended." Ms. Seinfeld also appeared to be a passionate advocate for feeding children healthy food, says Mr. Ross. As a result, Collins bought the book.

To keep pace with the demand for Ms. Seinfeld's book, Collins is now employing the full capacity of six binderies to churn out more copies. Mr. Ross says the books are being shipped directly to retail stores rather than to a HarperCollins warehouse. Although the spiral binding has complicated the manufacture of the book, Mr. Ross says that Collins is shipping new copies every day, with weekly tallies in the hundreds of thousands.

Mr. Ross says the books will continue to be manufactured and shipped through the end of January. "We're fairly confident that we'll sell between one million copies and 1.5 million copies through Dec. 25. And that's sell, not ship," he says. The book is also expected to sell well in January, a month when many consumers turn to bookstores for diet help. HarperCollins is owned by **News Corp.**, which has agreed to buy The Wall Street Journal's publisher, **Dow Jones** & Co., for more than $5 billion.

Meanwhile, Ms. Lapine's book will be No. 9 on the New York Times paperback advice list for Oct. 28.

**Write to** Jeffrey A. Trachtenberg at jeffrey.trachtenberg@wsj.com[1]

**URL for this article:**
http://online.wsj.com/article/SB119275104121964183.html

**Hyperlinks in this Article:**
(1) mailto:jeffrey.trachtenberg@wsj.com

**Copyright 2008 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

**RELATED ARTICLES FROM ACROSS THE WEB**
Related Content may require a subscription | Subscribe Now -- Get 2 Weeks FREE

**Related Articles from WSJ.com**
• What Were We Talking About?  Jun. 12, 2008
• Watch This Book  Jun. 09, 2008
• HarperCollins CEO Friedman to Leave Post  Jun. 05, 2008
• Growing Up With China  May. 01, 2008
**Related Web News**

- Bosses May Have Hastened Chief's Departure at HarperCollins - NYTimes...   Jun. 06, 2008  nytimes.com

**More related content**        *Powered by Sphere*